## JOHN S. HUNTER *v.* HARRY E. BAKER, Administrator, et al.

[No. 83, October Term, 1927.]

*Decided January 20th, 1928.*

The cause was argued before Bond, C. J., Pattison, Urner, Adkins, Offutt, Digges, Parke, and Sloan, JJ.

*John E. Wagaman*, for the appellant.

*Alexander Armstrong* and *Robert H. McCauley*, with whom were *John Henry Lewin, Scott Wolfinger*, and *Armstrong, Machen & Allen*, on the brief, for the appellees.

Digges, J., delivered the opinion of the Court.

Catherine Lee Rowland Thompson died near Hagerstown, in Washington County, Maryland, on October 10th, 1923. During the year 1917 the deceased was temporarily residing in the State of California, and on August 6th of that year she made a last will and testament, in her own handwriting, signed by her and witnessed by one witness. By this will she disposed of her property, consisting of personal property and real estate located in Washington County, Maryland. At the time of her death she left surviving her a sister, Sallie K. Baker, her sole heir at law. By the provisions. of her will she bequeathed this sister the sum of fifty dollars; a niece, Esta Baker Kaylor, daughter of Sallie K. Baker, five hundred dollars; and Mary F. Thomas five hundred dollars. The testatrix then, after providing for the erection of a monument, gave and devised all the rest of her estate, real, personal, and mixed, to her two cousins, Jane H. Hunter and Alice A. Hunter, as tenants in common. By the sixth item of the will it was provided: "If after the various bequests have been paid, my said two cousins, Jane H. Hunter and Alice A. Hunter, cannot divide the real estate to their entire satisfaction, I authorize and empower and direct my aforesaid executrix to sell all such real estate that cannot be divided as aforesaid at either public or private sale and divide the proceeds of sale equally among my said two cousins, Jane H. Hunter and Alice A. Hunter."

Jane H. Hunter was appointed executrix of the will. On October 23rd, 1923, Harry E. Baker, husband of Sallie K. Baker, was appointed administrator of the estate by the

Orphans' Court of Washington County. The will was produced by Jane H. Hunter to the said Orphans' Court and offered for probate in that court some time in the early part of December, 1923; whereupon the court fixed December 17th, 1923, as the time for a hearing with reference to the probate thereof; the date for the hearing being subsequently postponed to December 20th, 1923. On the last mentioned date Sallie K. Baker, the heir at law, filed a caveat objecting to the probate of the will, and an order was passed by the court requiring Jane H. Hunter, the executrix, to answer the petition and caveat. This answer and the replication thereto were filed during the month of January, 1924. No further action appears to have been taken in the matter until July 25th, 1924, upon which date Jane H. Hunter, the executrix, and Sallie K. Baker, the sole heir, filed an agreement in writing, signed by both parties and their respective attorneys, in the following language:

"Whereas, on or about the 11th day of December, 1923, Jane H. Hunter, party hereto, offered.for probate in the aforesaid court a certain paper writing purporting to be the last will and testament of a certain Catherine Lee Rowland Thompson, deceased, in which said paper the said Hunter was named as executrix, and to which said purported last will and testament a certain Sallie K. Baker, the only heir at law and distributee of the said decedent, did, on the 20th day of December, 1923, file a caveat or objection to the probating of said last will and testament and the proceedings relating to said offer of probate of said purported last will and testament and the caveat or objection thereto are now pending in the aforesaid court; And whereas, the said Sallie K. Baker and Jane H. Hunter, the executrix named in the said last will and testament, have agreed to mutually settle .and dispose of the respective contentions, relating to the probate or not of the aforesaid last will and testament; Now, it is agreed, this 25th day of July, 1924, that the said paper writing purporting to be the last will and testament of the said Catherine Lee Rowland Thompson,

deceased, shall not be admitted to probate, and that the aforesaid court shall refuse to admit said purported last will and testament to probate, and that the costs in the aforesaid matter shall be paid out of the estate of the said decedent."

On the same day the following order was passed by the Orphans' Court of Washington County:

"There having been filed in this court for probate, on the 11th day of December, 1923, a certain paper writing purporting to be the last will and testament of Catherine Lee Rowland Thompson, deceased, and Sallie K. Baker having on the 20th day of December, 1923, filed a caveat to said paper writing, asking that this court refuse to admit said alleged will to probate, upon which caveat this court passed an order requiring Jane H. Hunter to answer and she having filed her answer on the 9th day of January, 1924, to which answer replication was made by Sally K. Baker, and said Jane H. Hunter and Sallie K. Baker having this day filed in said proceedings a paper writing wherein it is agreed that said paper writing shall not be admitted to probate and that the court shall refuse to admit said purported last will and testament to probate, the court having read and considered all of the papers filed in said matter and said paper writing purporting to be the last will and testament of said Catherine Lee Rowland Thompson, deceased, bearing evidence on its face, that it had been destroyed before it was presented to the court. It is thereupon ordered, adjudged and decreed by the Orphans' Court of Washington County this 25th day of July, A. D. 1924, that said paper writing is not the true last will and testament of said deceased and that probate of the same be and the same is hereby refused. And it is further ordered that the costs of these proceedings be paid out of the assets of the estate of Catherine Lee Rowland Thompson, deceased."

There then followed an agreement between Sallie K. Baker and husband and Jane H. Hunter, making disposition of the

estate of the deceased. This agreement was entered into either on July 25th, 1924, or some subsequent date in July of that year, as the agreement recites: "It is agreed this day of July, 1924." Alice A. Hunter, one of the principal beneficiaries under the will, predeceased the testatrix, and left surviving her, as her heirs and personal representatives, eight sisters and brothers, among whom were Jane H. Hunter, the executrix, and John S. Hunter, the appellant. In the division of the estate, as set forth in the agreement between the Bakers and Jane H. Hunter, the executrix and one of the devisees and legatees, it was provided that the costs of the proceedings in the orphans' court be paid out of the estate; that Harry E. Baker, the administrator, be allowed commissions of three per cent. upon the personal estate which had come into his hands; that after the payment of the costs and commissions and any debts for which the estate might be liable, including taxes, out of the balance Harry E. Baker and Sallie K. Baker should pay the two legacies, each of five hundred dollars, provided for in the will, to Mary F. Thomas and Esta Baker Kaylor, and the remainder of the personal estate should be divided between Sallie K. Baker and Jane H. Hunter, the former receiving fifty-five per cent. thereof, and the latter forty-five per cent. As to the real estate, it was provided that Sallie K. Baker should dispose thereof by public sale, and after paying costs and expenses of the sale, and taxes, the proceeds thereof, including the rents to the date of sale, should be divided between Jane H. Hunter and Sallie K. Baker in like proportion as set forth in respect to the personal property. This agreement provided that the sale of the real estate should be made on October 1st, which was done, and the property sold in three parcels and conveyed respectively, first, to Ray R. Reed and Bertha M. Reed; second, to the Hagerstown Shoe & Legging Company, and third, to George W. Hull, by deeds of Sallie K. Baker and husband duly executed and recorded among the land records of Washington County; the grantees in these three deeds being among the defendants made in the petition of the appellant, the other defendants being the heir at law of the deceased, and her

husband, the surviving legatees named in the will, and the heirs at law and personal representatives of Alice A. Hunter, a deceased devisee and legatee named under the will. Subsequent to the order of the orphans' court refusing probate of the will, Harry E. Baker, the administrator of the estate, filed his first and final account on August 11th, 1925, which was duly approved by the said court.

On November 5th, 1926, the appellant filed a petition in the Orphans' Court of Washington County, the facts above set forth being a substantial recital of the allegations of his petition, and praying that the order of the orphans' court, passed July 25th, 1924, wherein the probate of the late will and testament was refused, be rescinded and annulled, and that said last will and testament be admitted to probate. To this petition answers were filed by certain of the defendants, to which answers a general replication was filed and testimony taken; whereupon the orphans' court, by order dated September 9th, 1927, dismissed the petition of the appellant. From that order the appeal here was taken.

The record discloses that Susan R. H. Williams, a sister and heir of Alice A. Hunter, on September 22nd, 1925, filed a petition in the orphans' court, similar to the one filed by the appellant in this case, and asking for the same relief. Before the petition of Susan R. H. Williams was heard, an agreement was reached between her, on the one part, and Sallie K. Baker and Jane H. Hunter on the other, whereby Mrs. Williams received a sum equivalent to that to which she would have been entitled as heir at law of Alice A. Hunter under the terms of the will. Whereupon the orphans' court passed an order on January 4th, 1926, that the proceedings under the Williams petition should cease, and that upon the court being satisfied that there had been paid by the respondents to the petitioner, Mrs. Williams, the sum ascertained by the auditor of the court which would be due her under the provisions of the alleged will of Catherine Lee Rowland Thompson, deceased, if said will had been probated and the estate had been distributed in accordance with its provisions, and that they, the said respondents, had paid the costs so far in-

.curred in these proceedings, there should be passed a further order dismissing the petition of Mrs. Williams. There is also in the record an opinion of the court, stating its reasons for passing the last above mentioned order, in which it was said:

"As further proceedings in this matter would be involved, should Mrs. Williams be successful in what she has prayed for, and there would be an interference with the rights of others who have obtained possession of the estate of Mrs. Thompson through the administrator, and in the view of the offer now made to settle this litigation, in the opinion of the court, further proceedings would be futile, inasmuch as they would result in the obtaining by Mrs. Williams of nothing more than she will obtain under this offer of settlement, the court is of the opinion that further proceedings in this case should cease and will pass an order that, upon being satisfied of the payment of the amount as ascertained by the auditor of this court, the register of wills, which would be due to Mrs. Williams had said alleged will been admitted to probate, and also being satisfied of the payment of the costs already incurred in these proceedings, they will pass a further order dismissing the petition of Mrs. Williams."

As will be seen, the facts presented by the record are somewhat involved, and we have deemed it necessary to set out at some length these facts. The important questions of law raised by the appeal are, in our opinion, two: First, was the order of the orphans' court passed on July 25th, 1924, refusing probate of the alleged last will and testament of Catherine Lee Rowland Thompson, valid, and, second, if not, has the appellant been estopped by his failure to act for more than two years after the passage of that order? The contention of the appellee is that both of these questions should be answered in the affirmative. We will consider them in the order stated.

A preliminary question arises in the case as to whether the paper writing alleged to be the will bore evidence on its

face of its invalidity: First, because there was only one witness to the will, and, second, because when presented to the orphans' court it bore evidence of its having been torn in several pieces and these pieces pasted together by the use of transparent paper.

In respect to the witnessing of the will, it is agreed that it was executed in compliance with the laws of the State of California, where the testatrix was residing at the time of its making. The question in this respect, then, is: Is a will executed in conformity with the laws of the temporary domicile of the testatrix valid in this state when it does not conform to the law of Maryland as to execution? Section 344 of article 93 of the Code provides: "Every will or other testamentary instrument executed without this state in the mode prescribed by law, either of the place where executed or of the testator's domicile, or according to the forms required by the law of this state shall be deemed to be legally executed, and shall be of the same force and effect as if executed in the mode prescribed by the law of this state, provided, said last will and testament is in writing and subscribed by the testator; and if the testator was originally domiciled in Maryland, although at the time of making the will or at the time of his death he may be domiciled elsewhere, the said last will or testamentary instrument so executed shall be admitted to probate in any orphans' court of this state." Under the provisions of this section, the execution of the will being in conformity with the law of California, and being in writing, signed by the testatrix, it was a valid will so far as the execution thereof is concerned.

The legal effect of the paper, as offered for probate, being torn, depends upon whether or not its mutilation was done by the testatrix with the intent thereby to revoke and cancel the will. Section 333 of article 93 of the Code provides: "No will in writing devising land, tenements or hereditaments, or bequeathing any goods, chattels or personal property of any kind, as heretofore described, nor any clause thereof, shall be revocable otherwise than by some other will or codicil in writing, or other writing declaring the same,

or by burning, canceling, tearing or obliterating the same, by the testator himself or in his presence, and by his direction and consent; but all devises and bequests so made shall remain and continue in force until the same be destroyed by burning, canceling, tearing or obliterating the same by the testator or by his direction, in manner aforesaid, unless the same be altered by some other will or codicil in writing, or other writing of the devisor signed as hereinbefore said in the presence of two or more witnesses declaring the same." It can only be revoked in the manner prescribed by the statute. *Woodstock College v. Hankey*, 129 Md. 683; *Sewell v. Slingluff*, 57 Md. 548; *Byers v. Hoppe*, 61 Md. 211; *Wittman v. Goodhand*, 26 Md. 106.

The will in this case had been subjected to such treatment as would revoke it, provided the tearing had been done by the testatrix while of sound and disposing mind, and with the intent that her act should operate to revoke the will. It had been torn, one of the methods provided by the statute for revoking a will; but it does not follow that every will which is presented in such condition should be refused probate, for it may well be that the tearing was done by some person other than the testator, or, if done by the testator, that it occurred accidentally, with no intention to revoke, or was done when the testator lacked the mental capacity which the law requires for such an act. No will can be revoked unless the testator has, at the time of revocation, the capacity to understand the nature and effect of the act, and such act must be free and voluntary, and the standard of mental capacity necessary to revoke a will is the same as that requisite for its execution. *Bagby's Executors and Administrators*, p. 11; *Rhodes v. Vinson*, 9 Gill, 170; *McIntire v. Worthington*, 68 Md. 206; *Preston v. Preston*, 149 Md. 498. While the paper presented to the orphans' court by the executrix bore evidence of its having been torn, it also showed that Catherine Lee Rowland Thompson had at one time made a will, in form capable of passing real and personal property in this state, and the orphans' court should have required testimony under oath in respect to the method

by which she came in possession of the paper, evidence of the circumstances surrounding the tearing thereof, and the mental condition of the testatrix at that time, if the evidence showed that the testatrix had torn it. If the record showed nothing to the contrary, we would be bound to presume that the orphans' court had performed its duty before passing the order refusing probate of the torn will; but the record does show that the executrix and custodian of the will had one or more conversations with the register of wills in respect to the offering for probate of the paper in question, and that the register of wills was told by the executrix that the will was torn "in a scuffle" between the testatrix and her cousin, Alice A. Hunter. The register of wills testified that he thinks he communicated this information to the orphans' court. He further testified as follows:

"Q. Did she tell you how it became torn? A. I don't recall anything more than that she stated it had been done by the decedent, because I was particular to inquire into that question. I wanted to know who had destroyed this paper or torn it, before it was presented. Q. When was it torn by the decedent? A. The time I cannot state. Q. She didn't mention any approximate time? A. If they did say I don't recall. Q. Did they say where? A. I don't recall that. Q. Do you know what year? A. I cannot fix that. Q. Or how long before the death of decedent? A. No. Q. Did they tell you anything about the state of mind of the decedent when it was torn? A. Yes, she intimated that it was her impression that when decedent destroyed the paper that she was not of sound mind. At least I have that impression. Q. What was said that gave you that impression? A. I don't know of anything in particular that was said, but just my conversation that I held with Miss Hunter at that time. I told her it was my impression that it was not a will, but she insisted that she wanted to present it to the court for probate. I suggested that she employ counsel, but she preferred to bring the matter to the court personally." The witness first testified that the executrix was accompanied by her sister Lucy Hunter, later correcting himself by stating that she was accompanied by

Mrs. Stigers instead of Lucy. Before this correction he was asked: "Q. Did Miss Lucy take any part in this conversation? A. I am inclined to think that she did; I think I talked to both the ladies. Q. They both thought she was of unsound mind at the time she tore the will, the decedent? A. I cannot say if both expressed that opinion, or whether expressed by one, or whether I gathered from the condition of affairs, or conversation. I have no distinct recollection of how I got the idea, but I got it from some source that that was their idea. Q. Do you know whether or not, Mr. Hollyday, this will was torn by the decedent at the home of Miss Jane Hunter? A. I don't know anything about the tearing of it except what the ladies told. If they told me where it was torn I do not recollect it. The only ideas that remained with me that I gathered from them was, that it had been torn by the decedent and had been pasted together by some other person. * * * Q. Can you give the date about when Miss Jane Hunter presented this will and made those statements? A. This paper was filed in this office for probate on the 11th day of December, 1923. I do not know whether or not I had a conversation with Miss Hunter prior to that date or not. I may have talked to her in regard to it before that date. It was left on that date and has remained here ever since. Q. Did you make any record of what they said? A. I did not at that time; I was only talking in an ordinary conversation; Miss Hunter wasn't testifying as a witness." In the beginning of his testimony this witness stated as follows: "Q. At the time this alleged will was brought to you by Miss Jane Hunter did you ask her the usual questions how she obtained that paper? A. I questioned Miss Jane Hunter in regard to this paper writing; just the exact questions I asked her I don't recall, but I did question her about it. Q. What did she tell you about the paper? A. The paper when brought to me appeared on its face, that it had been torn into a number of pieces and had been pasted together. I questioned Miss Hunter in regard to this matter, as to how the paper might have been torn, and was informed that it had been torn by the decedent. I then asked her who pasted it together, and was

informed that it had been pasted together by some person other than the decedent, I don't recall who she stated had done it, but I do know it was some one other than the decedent. * * * Q. Did you communicate the information you obtained to the court? A. I think that I did. Q. Did she say when it had been put together? A. No, I am not clear as to the time it had been pasted together; my impression is that it was very shortly after it had been torn to pieces, that the pieces had been gathered up and pasted together, but I am not so sure about the time. Q. Did she tell you where the pieces were found? A. I have no distinct recollection of her stating where they were found; she probably told us, but I do not recall at this late date."

The witness Mrs. Stigers, who was present at the time of the conversation between the testatrix and the register of wills, in speaking of that conversation, testified: "Q. What, if anything, did Miss Jane Hunter tell Mr. Hollyday with reference to the tearing of this will? A. She told him that it was torn. I don't know just how much I can tell. And she was very much excited; that is, Catherine Lee Thompson was, my cousin. Miss Hunter, she wanted to probate the will. Mr. Hollyday said she better get counsel. That was the time I was with her. I was only with her the one time, that is when she first presented it; and Mr. Hollyday, that is all he said. Q. Did she say when this will was torn? A. Yes, she told him it was torn. Q. When did she say it was torn? A. After she came from California; directly after Kitty came from California and was in a high statement of excitement she got in the desk and other papers. Q. Just relate what Miss Jane said to Mr. Hollyday? A. Miss Jane asked Mr. Hollyday about the will for probate and Mr. Hollyday took the will and read it and told her she needed counsel on it, and then he asked about the tearing of it and she told him, as near as I remember, that it was torn when Kitty Lee Thompson was in a high statement of excitement, gathering up things for fear something would happen to the Hunter family; she got my sister Jane's papers, where the will was kept and some of my sister's papers, and my sister Alice, in

getting them away from her and getting her quiet, they were torn and several other papers. Q. Did Miss Jane explain how the will was repaired as you see it now? A. Yes. Q. What did she say to Mr. Hollyday on that occasion as to how it got torn? A. In gathering up the things, she was in a high state of excitement and my sister Alice in getting the papers from her, that is the way the will was torn? Q. Can you remember the time at which she said it was torn? A. Just before they took her to Sheppard-Pratt. Q. Did Miss Jane tell Mr. Hollyday when the will was torn? A. That I don't remember; she may have, I don't remember that. Q. She didn't fix the time? A. I never heard any time. Q. Did she tell where it was torn, at whose house it was torn? A. At Tower Hill and in Jane's room; Mr. Hollyday didn't ask where it was torn, but he asked how it was torn. Q. Did she tell Mr. Hollyday what was the state of mind of Catherine Lee-Rowland Thompson at the time she tore it? A. Yes. Q. What did she say? A. She was very much out of her mind. Q. At the time she tore the will? A. At the time she tore the will." On cross-examination this witness stated: "Q. When did this conversation take place with Mr. Hollyday and your sister Jane? A. As I told you before, I think it was in the fall sometime. It was the first time she brought the will to the court; you must have it down. The first time I was with her and the only time. Q. Who were present at the interview between your sister and Mr. Hollyday? A. No one but Mr. Hollyday and my sister and myself. * * * Q. Your sister didn't say anything as to where this will was torn; she simply told how it was torn? A. She told him she got it out of her desk; she was excited, and Alice tore it in getting it away. Q. So as a matter of fact it was torn in the scuffle, as it were, between the two; that is what your sister told Mr. Hollyday? A. As I remember. Q. Was that all that she said about the matter, Mrs. Stigers? A. As far as I remember; except that Mr. Hollyday rather insisted that Jane would need counsel; he told her that a couple of times. * * * Q. All that was told Mr. Hollyday was that in this scuffle the will was torn by Miss Alice and Mrs. Thompson? A. Yes, and

Mrs. Thompson excited, I said. Q. All that your sister said about the state of mind of Mrs. Thompson was that she was in a very excited state? A. Yes. Q. That is all she told about her state of mind? A. They knew her mind was gone. Q. I am talking about the conversation between your sister and Mr. Hollyday, and all she told him was that Mrs. Thompson was in a very excited state of mind? A. I don't know whether she used the word excited or not, but she give him to understand that Mrs. Thompson was not in her mind when the will was torn. Q. You don't remember the exact words? A. Not the exact words. I have told you what I remember. It is almost impossible to remember the exact words. But I know that Mr. Hollyday must have understood that Kitty was not in her right mind. I think Mr. Hollyday said so himself, that she needed counsel on that account."

Lucy Hunter, a sister of Alice A. Hunter, a witness for the petitioner, testified thus: "Q. Do you keep a diary, Miss Hunter? A. Occasionally. Q. Can you tell from your diary what time the testatrix, Mrs. Thompson, came from California to Maryland; that is, her last coming from California to Maryland? (Objected to.) By the court: Anything relating to the probate of this will is not before this court and is irrelevant. (Objection sustained.) Q. Did you see Mrs. Thompson, the testatrix, soon after she came to Washington County, Maryland, the last time, from California? (Objected to; objection sustained.) Counsel for petitioner: We are endeavoring now, with all due deference to the court, we are trying this case according to our theory; that is usually the case. We have a right at least to take the case to the Court of Appeals on our theory; we want to make this proffer: We proffer to show by the witness' testimony, proving that the testatrix was a resident of Washington County, Maryland, from the time she made her last trip from California until she died. We proffer to show by this witness that at the time of the making of the alleged will she was a resident of the State of California. We proffer to show by this witness that, at the time of the testatrix' coming

on this last trip which we have mentioned, she was of unsound mind and incapable of making a valid deed or contract, and so continued in that state of mind until her death. We proffer to show by this witness that the will offered here in this court was intact and untorn or mutilated at the time she came from California to Maryland on her last trip, and that, while residing in this county, and while insane as we have stated, this will was torn, as shown by an examination of it, at the Hunter home, at the home of Miss Lucy Hunter, the witness on the stand, and Miss Jane Hunter, and known as the Hunter home. We offer to show by this witness that this witness was attending the testatrix because she was of unsound mind, as stated, at the time the will was torn, and how and under what circumstances the will was torn, as we see it in court, and that the testatrix was of unsound mind, as we have stated, at the time it was torn. We want to show the date, we want to show the time, the circumstances and the reasons why, by this witness, that the testatrix was taken to Sheppard-Pratt Institution for the treatment and care of the insane. We proffer to show by the witness that Miss Jane Hunter was not in court on the 25th day of July, 1924. Also we proffer to show by this witness that the whole of the will of the testatrix is in the handwriting of the testatrix, Catherine Lee Rowland Thompson, including the signature, and everything to it of writing other than the witness." Objection to the proffer was sustained.

The will was filed for probate, and the heir at law interposed a caveat. Before the questions raised by the caveat were passed upon by the orphans' court, or any issues sent to a court of law, the executrix, whose duty it was to propound and sustain the will, entered into an agreement with the heir that the will be refused probate, by which agreement the executrix received practically the same proportion of the estate as she would have gotten had the will been probated. This agreement was filed in court, and we are unable to escape the conclusion, after considering carefully the whole case as disclosed by the record, that the orphans' court was

influenced, in passing its order refusing the will probate, by the agreement filed, wherein it was provided that the executrix and the heir agreed that the will should not be probated. The language of the agreement, and the order of the court passed immediately upon its filing, indicate that the above is true. Up to the time the agreement between the executrix and the heir was filed, there had been raised in the orphans' court an issue as to the validity of the will, the executrix on one hand contending for its validity, and the heir, the caveator, on the other, against its validity. This position of the executrix, as a propounder and defender of the will, was proper. When later she shifted her position, and for a consideration, of which the court was cognizant, ceased to be a friend of the will and became its enemy, the court should not have refused probate of the will without notifying the other beneficiaries, and requiring testimony fully disclosing the circumstances under which the will was torn. At the time the order was passed, there was no friend of the will in court, the one upon whom the law particularly places the duty of probating and defending it having changed her position.

The petition of the applicant asked two things: That the order refusing probate of the will be rescinded, and that the will be admitted to probate. They are logically, in effect, seeking the same end, and evidence tending to show that the will should be probated necessarily materially affects the question of whether the order refusing probate should be rescinded. It may be that testimony could be given necessitating the revocation of the order refusing probate, while such testimony would not necessarily be sufficient for the probating of the will, such as fraud in the procurement of the order refusing probate. The theory of the orphans' court, at the hearing upon the appellant's petition, was that his evidence must be confined to showing that the court acted without authority, or was fraudulently imposed upon, in passing the order refusing probate, and that no evidence tending to prove that the will should have been probated

was admissible until the former order refusing probate had been rescinded. Proceeding upon this theory, the court consistently rejected all testimony relating to the circumstances surrounding the alleged cancellation of the will by tearing. We are of the opinion that the theory upon which the court acted was erroneous, and therefore there was error in rejecting testimony to the effect that, at the time the will was torn by the testatrix, she was mentally incompetent to revoke it.

It is shown by the record that the testatrix was formally adjudicated *non compos mentis* upon inquisition in June, 1921. Certainly, if the testatrix tore the will at a time when she was in the same condition as when adjudicated insane, such tearing would not be a legal revocation; and yet the orphans' court refused to allow answers to all questions which might fix the date of the tearing, or the mental condition of the testatrix at such time. We think the record discloses that, at the time of the passage of the order of July 25th, 1924, the court heard no evidence whatever as to the mental condition of the testatrix at the time the will was torn, or the circumstances surrounding its alleged cancellation, but based its order upon the evident physical fact that the paper writing purporting to be a will was torn, and the further fact that there was filed in the case an agreement in writing between the executrix and the sole heir at law that the will be refused probate; and this in spite of the fact that the court, in an opinion filed more than three years later, disclaimed that their action in passing the order was based upon said agreement. In *Sewell v. Slingluff, supra,* it was said: "Wills are more especially guarded and protected by the law than any other instrument. They are guarded in their inception by the formality required by our statute, and after they are made they are equally guarded by our statute which points out the only mode by which they can be revoked or annulled."

In the case of *Emmert v. Stouffer,* 64 Md. 543, the testatrix made a will in which her two sons were named executors and beneficiaries for life, with remainder as to each to their respective children. This will was presented to the orphans'

court, and at the same time there was presented a petition by the two sons repudiating their appointment as executors, alleging the invalidity of the will on the ground of the mental incapacity of the testatrix, and asking for the appointment of an administrator. A day was set for hearing on this petition, and summons issued for the appearance of the subscribing witnesses to the will and such other witnesses as the petitioners requested. After hearing, the orphans' court passed an order reciting that: "The court having heard the testimony of witnesses concerning the paper purporting to be the last will and testament of Eliza Stouffer, and the court being satisfied that at the time the said paper was executed by her she was not capable of making a valid deed or contract, and that the said paper writing is not her last will and testament"; thereupon it was adjudged, ordered and decreed by the court that the said Eliza Stouffer died intestate, and letters of administration upon her estate be granted to Daniel B. Stouffer. A portion of the real estate of the deceased was sold to John W. Emmert, he having no knowledge of the proceedings in the orphans' court. Upon learning of these proceedings, he refused to pay the purchase price, and a bill for specific performance of the contract of sale was filed by Stouffer. On appeal the majority of this court held that under such circumstances the will had never been before the court for probate, and, therefore, the orphans' court was without jurisdiction to pass the order refusing probate. In the course of the majority opinion it was said: "The court heard such testimony as was offered by the petitioners who assailed the will; but no opportunity of being heard was afforded to those persons who were interested in maintaining it. In point of fact, as we learn from the record, they all reside in Illinois, and some of them are under the age of twenty-one years. There were no opposing parties before the court; there was no issue affirmed on one side and denied on the other. Its decision was pronounced upon an application entirely *ex parte*. Our conclusion is that it had not the jurisdiction to decide the question of probate under these circumstances. The judgment rendered by the

orphans' court is, therefore, in legal effect merely a grant of letters of administration, and this, we have seen, will not prevent the probate of a will." In a separate opinion Judge Alvey agreed with the conclusion reached by the majority, but took the position that the will was actually before the court for probate; and then proceeded: "But the question here is, whether the refusal of probate to this paper, under the circumstances of the case, will finally bind and conclude the parties entitled in remainder, those parties being non-residents, and some of them infants, and who were in no manner represented in the proceedings that took place in the orphans' court in regard to the paper exhibited by the two sons named as executors therein, those proceedings being entirely *ex parte*. The two sons named as executors repudiated the appointment, and opposed the admission of the paper to probate. It was their personal interest to do so, and it was their strict right also. But their assuming such position left the will of the deceased without a friend to vindicate it before the court. It was produced and exhibited to the court by its enemies simply and solely for the purpose of having its validity pronounced against; and, of course, in the absence of any representative of the deceased, or her estate, there was but small chance for the support of the paper as a valid will. Where, as in this case, there is no party before the court who has an interest in supporting a testamentary paper produced, the general principle is, that the court, before it proceeds to act, will require the appearance of such a party, or some one to represent him (*Redwill v. Redwill*, 3 Phillimore, 410); and that course would seem to be dictated by the first principles of justice. But with respect to the paper in question no such course was pursued."

It will thus be seen that the majority of the court held that under the circumstances of that case the will had never been presented to the orphans' court for probate, the reason for that conclusion being that it had not been presented to the court by any person desiring to have it probated, but on the contrary, only by enemies of the will whose purpose it was to have the court refuse probate. In his dissent Judge Alvey

was of the opinion that the will was actually before the court for probate, but that any will in such position, that is, with no one before the court interested in and demanding probate, created a situation wherein the orphans' court could pass no valid order refusing probate without first giving notice to some one to whose interest it would be to have the will probated. In that case, as in the case now before us, so far as the result is concerned, it makes no difference whether the will was or was not actually before the orphans' court for probate, the conclusion being in both cases that where a will is presented to the court by its enemies for the purpose of having it declared invalid, the court has no authority to pronounce a judgment of invalidity without first summoning some one whose interest it would be to have it probated. Such a judgment, to be valid, should not be *ex parte*, but should only be rendered upon an issue affirmed on one side and denied on the other.

The view which we have taken, that the action of the court in passing the order of July 25th, 1924, refusing probate of the will, was influenced by the agreement of that date between the executrix and the sole heir at law, is strengthened when we consider the action of the court in respect to the petition filed by Mrs. Williams in September, 1925. Mrs. Williams had the same interest in the estate of the deceased under the will as the appellant in this case, she being a sister of Alice A. Hunter and the appellant being a brother. The prayers for relief were identical with those contained in the petition of the appellant. It was filed more than a year after the passage of the order refusing probate, and the final administration account, and eleven months after the sale and conveyance of the real estate. Shortly after the Williams petition was filed, the executrix and the sole heir at law again come in and agree that they will pay Mrs. Williams the amount which she would have received had the will been probated; whereupon the orphans' court, after reciting this agreement, ordered that the proceedings in that case cease, and that upon the court being satisfied that such amount as found by the register of wills would have been due Mrs.

Williams under the will had been paid to her by the executrix and the heir at law, the court would pass a further order dismissing the petition. This indicates that the court treated the executrix and the heir at law as entitled to dispose of the estate according to their wishes, and the willingness of the court to pass orders agreeable to their desires.

We come now to the question of whether or not the appellant had a standing, at the time he filed his petition, to attack the validity of the order of July 25th, 1924. It is evident from the record that the appellant is a capable lawyer of long standing, residing in the State of Oklahoma for the past twenty years or more; that he knew of the death of Mrs. Thompson, and the existence of the will, shortly after her death if not before; that his sister Jane was named executrix and that she had filed the will with the orphans' court; that his sister Alice predeceased the testatrix and that under the law of Maryland he would be a beneficiary with an interest in the alleged will; that he was familiar with the Maryland law in regard to estates; that the will had been torn in pieces and had been pasted together again; that a caveat had been filed by the Bakers, and that he knew of such action within a month or two after it was filed; that Mr. Mason was counsel for the executrix; that he knew of the proceeding instituted by Mrs. Williams for the purpose of setting aside an agreement and probating the will; that he had received a share of the estate in two checks signed by Jane H. Hunter individually and not as executrix; that Harry E. Baker, the administrator, was making collections for the estate; that he was in constant communication with the executrix and other members of his family residing in Washingon County; that his sisters and brothers in Maryland were sending him copies of papers and clippings from newspapers relating to the caveat; that in the fall of 1923 he was writing "quite often in regard to Kitty's affairs," offering advice and suggestions to Jane as to how to defend and uphold the will, urging her to fight for the will and her sisters to support her with money and testimony; that he suspected the integrity of the Bakers, and knew the timidity and backwardness of his sister Jane, the execu-

trix; that he wrote to Mr. Mason, counsel for Jane, inquiring as to the status of the proceedings shortly after the decedent's death, and about the time he learned that the will was torn and that the caveat had been filed; that he came to Hagerstown in September, 1926, and lived at the Hunter home, three of his sisters, including Jane, living there at that time; that he had ample opportunity to discuss matters pertaining to the estate with them, and might have said something to Jane about it; that during the same visit he saw and talked to Mrs. Williams. It is clear that he had this information, from his own testimony and the letter of December 30th, 1923; and, from a reading of the whole of his testimony, it is not unfair to characterize it as lacking that degree of frankness which would be expected of a witness endeavoring to fully disclose the information in his possession. In reply to many questions upon matters of which an intelligent man in his position must have had knowledge, his answers are vague and elusive. His testimony is indicative of one who, while not falsifying, nevertheless is evading, and concealing information and knowledge, which, if admitted, would estop him from asserting the claim made by his petition. The caveat was filed by the heir at law before action was taken on the probate of the will, the same having been filed on December 20th, 1923, and the appellant had notice thereof within ten days, as shown by his letter of December 30th, 1923. He was at liberty to participate as a party defendant in those proceedings. This, we think, he did, as indicated by the letter referred to, in which he gave counsel and advice to the executrix named in the will, directing how the proceedings should be conducted, how evidence could be obtained in support of the will, and requesting some of his sisters to contribute money and testimony for that purpose. He did not see fit to be made a party on the record, but in view of his acute interest manifested in the case at that time, as shown by his letter and testimony, including his correspondence with the attorney for the executrix, it is inconceivable that he would suddenly lose all interest in the matter and fail to know of the agreement entered into between the heir at law

and the executrix, and the order of court passed in pursuance thereof. We are forced to the conclusion that he did have such knowledge. He accepted two checks, signed by his sister individually and not as executrix of the estate; and further, he knew that Harry E. Baker was acting as administrator of the estate and collecting its assets. He was aware of the filing of the Williams petition in September, 1925, and that its purpose was to set aside the agreement of July 25th, 1924, and probate the will. As a lawyer, he knew the legal significance of these facts, and yet waited until November, 1926, before filing the petition in this case. This was two years and three months after the passage of the order which he now seeks to set aside, and more than two years after the final administration account was passed and the real estate conveyed to the purchasers thereof. Under the circumstances disclosed by this record, we are of the opinion that the appellant has been guilty of such laches as to estop him from successfully maintaining his contention.

It is manifest that the testamentary system of this state is framed for the purpose of preventing all unnecessary and needless delays in the settlement and distribution of decedent's estates, and to secure as prompt and speedy settlements as practicable. *Edwards v. Bruce*, 8 Md. 387; *Bowers v. Cook*, 124 Md. 567. This purpose cannot be given force and effect if one is to be allowed to successfully attack orders and decrees of an orphans' court after the lapse of time disclosed by this record, when the applicant had actual knowledge of the passage of such order or decree, or had knowledge of facts the inquiry into which would have disclosed such action by the court. Section 66 of article 5 requires that appeals from orders or decrees of the orphans' court be taken within thirty days after such order or decree appealed from. While the statute does not provide within what time a petition must be filed for the revocation of an order or decree passed by the orphans' court, this court, while recognizing that a petition to revoke is a proper proceeding, has applied by analogy the period within which appeals are allowed by

the statute. *Redman v. Chance,* 32 Md. 42; *Stanley v. Safe Deposit Co.,* 88 Md. 401; *Edwards v. Bruce, supra.*

In the case of *McColgan v. Kenney,* 68 Md. 258, where a petition was filed for the revocation of letters of administration, there was no direct testimony that the petitioner had actual knowledge of the administrator's appointment. It did appear, however, that she knew facts which were consistent with the fact of that appointment. She had asked the administrator to pay debts of the deceased, and to sell a portion of her personal estate, acts which could be done by the administrator alone. The petition was filed more than a year from the date of the administrator's appointment, and this court held that it was too late. "Whatever fairly puts a person on inquiry is sufficient notice, where the means of knowledge are at hand; and if he omits to inquire, he is then chargeable with all the facts which, by proper inquiry, he might have ascertained. This, in effect, means that notice of facts which would lead an ordinarily prudent man to make an examination which, if made, would disclose the existence of other facts, is sufficient notice of such other facts. A person has no right to shut his eyes or his ears to avoid information, and then say that he had no notice; he does wrong not to heed the signs and signals seen by him. It will not do to remain wilfully ignorant of a thing readily ascertainable. It has been said that a want of actual knowledge in such a case is a species of fraud." 20 R. C. L. 346.

We have said that it is hard to believe that the appellant did not have actual knowledge of the passage of the order now sought to be revoked; but even if this were not true, he did have knowledge of such facts as would put an ordinarily prudent man upon inquiry as to the status and progress of the litigation. Had such inquiry been made by the appellant, he would have made discovery of the passage of the order, of which he now denies knowledge, at or shortly after the time of its passage. Accepting as true his statement that he had no actual knowledge, nevertheless, under all of the circumstances of this case, we think that he at least had positive knowledge of such facts as required him to make inquiry

within a reasonable time, and that he is bound by such knowledge as that inquiry would have disclosed. If he neglected to make the inquiry and become possessed of the knowledge which would thereby have been disclosed, but waited more than two years, and until rights and interests of *bona fide* purchasers had intervened, he is guilty of such laches as to prevent recovery.

*Order affirmed, with costs to the appellee.*