BARTON B. SKEEN ET AL. *v.* WILLIAM J. McCARTHY
ET AL.

[No. 1215, September Term, 1979.]

*Decided September 4, 1980.*

The cause was argued before GILBERT, C. J., and MORTON and MELVIN, JJ.

*Howard G. Goldberg,* with whom were *William B.*

*Somerville, Susan Z. Whitman, Lee N. Kohler* and *Smith, Somerville & Case* on the brief, for appellants.

*Richard W. Emory,* with whom were *Thomas E. Lynch, III* and *Venable, Baetjer & Howard* on the brief, for appellee William J. McCarthy. Richard A. Reid, with whom were *Royston, Mueller, McLean & Reid* on the brief, for appellees, Edward S. Buckler, Jr., and A. Benham Cecil.

MELVIN, J., delivered the opinion of the Court.

## I

On May 26, 1948, McCarthy-Hicks, Inc., a Maryland corporation, created an express trust known as "Profit Sharing Trust of McCarthy-Hicks, Inc." The trust was intended to meet the requirements of Section 165 of the federal Internal Revenue Code and amendments thereto so as to render non-taxable contributions to a trust fund thereby created. Under the profit sharing plan embodied in the trust instrument the Company was to contribute annually to the trust fund, subject to certain provisos, 10% of the Company's annual net income; the employees contributed nothing. The Company could, however, unilaterally amend the 10% provision to provide for a different contribution by the Company or, presumably, no contribution at all. Pursuant to Section 165 of the Internal Revenue Code the trust was "for the exclusive benefit" of the Company's eligible employees, the trust fund to be used for pensions for eligible employees or their designated beneficiaries upon the employees' death or retirement.

The trustees named in the trust instrument were F. Jordan McCarthy, Edward S. Buckler, Jr. and A. Benham Cecil. F. Jordan McCarthy was the president and principal stockholder of McCarthy-Hicks, Inc. Buckler and Cecil were secretary and treasurer, respectively, of McCarthy-Hicks, Inc. The three men remained as the sole trustees of the profit sharing trust until 1971, at which time Mercantile-Safe

Deposit & Trust Company became the sole trustee. F. Jordan McCarthy died in 1976.

In 1953 or 1954, McCarthy-Hicks, Inc. became interested in finding a new location for its business offices as its then facilities in Baltimore City had become inadequate. A 62 acre tract of land, undeveloped and unimproved, was found in Baltimore County. The Company, however, needed only twelve to fifteen acres for its use. F. Jordan McCarthy suggested that his son, William J. McCarthy (then a law student at Harvard University), Buckler, and Cecil purchase the property. Apparently, F. Jordan McCarthy made this suggestion with three purposes in mind: 1) to obtain a new site for McCarthy-Hicks, Inc.; 2) to provide an investment opportunity for his son, William, and his trusted associates, Buckler and Cecil, whom he desired to reward for their long-time devotion to him and his company; and 3) to provide a good investment for the profit sharing trust. To accomplish these purposes he, with the advice and expert legal advice of attorney John Wright (who was then acting as counsel for the company, the Profit Sharing Trust and F. Jordan McCarthy personally) structured the following transactions: A corporation known as Planned Industrial Properties (hereafter referred to as PIP) was formed with Buckler, Cecil and William McCarthy as sole officers and stockholders. PIP purchased the property for $155,000. To help finance the purchase the Profit Sharing Trust loaned to PIP $93,000 for five years at 6% interest.[1] The loan was secured by a first mortgage on the property. The balance of the purchase price was obtained from a $45,000 loan to PIP from McCarthy-Hicks, Inc. at 4% interest, secured by a second mortgage on the property, and from loans and contributions from the three stockholders of PIP. As part of the consideration for the $45,000 loan from McCarthy-Hicks, Inc., PIP granted to McCarthy-Hicks, Inc. an option to purchase that portion of the property needed for its new business site.

---

1. This was approximately twice the return the trust was receiving from its investments up to that time. By the terms of the trust instrument real estate was not a permitted investment. Accepting a real estate mortgage as security for a loan, however, was not prohibited.

In September 1960, PIP was dissolved as a corporation and the 62 acre tract placed in the individual names of William J. McCarthy, Edward S. Buckler, Jr. and A. Benham Cecil, subject to the $93,000 mortgage held by the Profit Sharing Trust and the $45,000 mortgage held by McCarthy-Hicks, Inc. Shortly thereafter, 18 acres of the property were sold to John Deere and Company for $225,000 and the $93,000 loan from the Profit Sharing Trust was paid in full. In 1966, McCarthy-Hicks, Inc. exercised its option and purchased 12 acres of the property for $388,000. By 1972, the remainder of the land had been sold for $850,000.

In 1977, the appellants, Barton G. Skeen, Joseph M. Braden and Alfred H. Erskine, three retired employees of McCarthy-Hicks, Inc., filed this equity action in the Circuit Court for Baltimore County against William J. McCarthy, individually and as personal representative of the estate of F. Jordan McCarthy, and Buckler and Cecil. They alleged that the 1954 transactions whereby the former trustees of the Profit Sharing Trust (F. Jordan McCarthy, Buckler and Cecil) loaned $93,000 to PIP, a corporation owned by two of the trustees (Buckler and Cecil) and the son of the other (F. Jordan McCarthy), constituted "self-dealing" and rendered them, along with William J. McCarthy, liable to the Profit Sharing Trust for all profits resulting from the sale of the 62 acres.

The chancellor ultimately dismissed the action against William J. McCarthy individually, but found the other three defendants liable and assessed damages. Both sides appealed, the plaintiffs' chief complaint being that the damages awarded were inadequate and the defendants' that the chancellor erred in rejecting their defense of laches and that in any event they are not liable for any damages.

## II

After a careful review of the record before us we conclude that the chancellor erred in ruling that this action was not barred by laches. We shall therefore remand the case with directions to the circuit court to dismiss the bill of complaint.

There is no inflexible rule to be applied in determining the application of the equitable doctrine of laches. As said by the Court of Appeals in *Parker v. Board of Election Supervisors, et al.,* 230 Md. 126, 186 A.2d 195 (1962): "This Court has had occasion to deal with the question of laches many times. It is a defense in equity against stale claims, and is based on grounds of sound public policy by discouraging fusty demands for the peace of society. There is no inflexible rule as to what constitutes, or what does not constitute, laches; hence its existence must be determined by the facts and circumstances of each case." 230 Md. at 130. Quoting from Phelps, *Juridical Equity* (Abridged Ed.), the Court of Appeals in *Akin v. Evans, Executor,* 221 Md. 125, 156 A.2d 219 (1959), said:

> " 'In equity, a presumption exists against every stale claim, because, as a general rule, persons who have a right, and know that they have it, are prompt to assert it. But they do not always do so, and therefore the circumstances of each particular case which may explain the delay, usually control the application of the rule as to laches. * * * We find the principle constantly reiterated that each case must necessarily be governed by its own circumstances, such as the situation of the parties, the extent of their means of information, great changes in values, the want of probable grounds for the imputation of intentional fraud, the loss of evidence, and the presence or absence of impediments to the assertion of the claim.' Phelps, *op. cit.,* 356, 357. Judge Phelps on page 358 goes on to say that the intervention of an important death is not an unusual characterization of a case of laches." 221 Md. at 132, 133.

In *Akin,* the Court went on to say:

> "In *Rettaliata v. Sullivan,* 208 Md. 617, in holding that laches applied, largely because of death, the Court quoted what had been said in

*Kaufman v. Plitt,* 191 Md. 24, 29: 'Ordinarily the
defense of laches must include not only lapse of time
but also some prejudice to the defendant' and added:
'The cases recognize that the death of a material
witness may constitute prejudice.' *Weber v. Bien,*
143 Md. 561, 567; *Dorsey v. Stone,* 197 Md. 220,
223; *Hammond v. Hopkins,* 143 U.S. 224, 250, 36 L.
Ed. 134, 145." 221 Md. at 133.

In the case before us, the chancellor found that the
trustees had a duty to make a "full disclosure" "to all
beneficiaries [of the trust]" of their use of trust funds to
purchase the 62 acres and that they failed in that duty. On
the issue of laches, he said: "Without disclosure there can be
no knowledge, and *without knowledge, there can be no
laches."* (Emphasis added). The chancellor inferentially
accepted the plaintiffs' testimony that they had no knowl-
edge of the $93,000 loan until shortly before they filed suit
in July, 1977 — over 22½ years after the loan was made
and after the death of F. Jordan McCarthy and his attorney,
the two persons who undoubtedly knew most about the
circumstances under which the loan was made and about
what information was or was not given or made available to
the employees, including the plaintiffs, concerning it.

In Maryland it is well settled that in order to establish
laches as a defense it is not necessary that a defendant show
that the plaintiff had actual knowledge of his claim. As
stated by Judge Levine for this Court in *Brady v. Berke,* 33
Md. App. 27, 34, 363 A.2d 537, 541 (1976); "In fact, it is well
settled that time begins to run, for purposes of laches, from
the time the party charged with it should have had knowl-
edge or the means of knowledge of facts giving rise to his
right or cause of action." *See also McCoy v. Poor,* 56 Md. 197,
205 (1881) (suit alleging breach of trust dismissed for laches
because "complainants failed to take the trouble to examine
for themselves . . . . They did not exercise that reasonable
diligence which a court of equity requires to appear before it
will interfere to enforce a claim thus situated"); *Hunter v.
Baker,* 154 Md. 307, 331-332, 141 A. 368, 377 (1928)
("Accepting as true his statement that he had no knowledge,

nevertheless, under all the circumstances of this case, we think that he at least had positive knowledge of such facts as required him to make inquiry within a reasonable time and that he is bound by such knowledge as that inquiry would have disclosed.")

In the case at bar, there are no allegations, and no proof, of any fraud, deceit or concealment on the part of the defendants in connection with the $93,000 loan to PIP. All documentation concerning the purchase of the 62 acres by PIP and the loan from the trust was duly recorded in 1954 among the Land Records of Baltimore County. The ownership of the PIP property by William J. McCarthy, Buckler and Cecil was always open and notorious with wide public exposure. One of the plaintiffs, Mr. Skeen, testified that a former fellow salesman, Mr. Bromwell, now deceased, told him several years before the instant suit that "they" had "made a lot of money" on the sale of the property. He "thought" it was the Profit Sharing Trust acting through the trustees that owned the property. But the trust records showed that the trust held only a $93,000 mortgage from PIP. These records were open to the inspection of all employees, including the plaintiffs, who were encouraged to make any inquiries they wished concerning any details of the trust and its investments. The trust instrument itself contained a provision for a committee of employees who had full access to all details of the trust and its administration. The record shows that McCarthy-Hicks, Inc. was a relatively small informally run company. All the plaintiffs agreed that F. Jordan McCarthy, the dominant force in the company, as well as defendants Buckler and Cecil, were honest and fair in their dealings with the employees and "concerned" with their welfare. One of the plaintiffs characterized F. Jordan McCarthy as "very wide open." There was strong evidence from the testimony of several witnesses that it was "common knowledge" among the employees that William M. McCarthy, Buckler and Cecil had incorporated as PIP to purchase the property and that the Profit Sharing Trust had loaned them money to help finance the purchase. There was direct testimony from ten of the employees that in the 1950's

and early 1960's they knew of the trust loan to PIP, a corporation directly controlled by two of the trustees and the son of the third trustee. Two other employees were identified as having like knowledge. In addition, there was evidence that another employee and participant in the Profit Sharing Trust notarized many of the relevant documents that evidenced the entire transaction.

There was uncontradicted testimony that McCarthy-Hicks, Inc. maintained a club or meeting room known as the "Crown Room" which had an open bar with free drinks after meetings. It was frequented in particular by salesmen of the company, including the plaintiffs, although plaintiff Skeen was not as regular in attendance as the others. Every Thursday afternoon there was a compulsory sales meeting in the Crown Room. Two of the employees testified positively that at one of the meetings in the Crown Room in 1956 or 1957 F. Jordan McCarthy announced the purchase of the PIP property by William J. McCarthy, Buckler and Cecil and the loan to them from the Profit Sharing Trust. Plaintiff Braden recalled the meeting and that McCarthy had announced the purchase but was uncertain whether he said that "we" or "they" had purchased the property. Plaintiff Erskine did not recall the meeting but said "no doubt it took place."

While none of the plaintiffs would admit they had actual knowledge of the loan from the trust to PIP until 1977 when plaintiff Skeen examined the land records, the record shows that each of them had some awareness as early as the 1960's of a connection between the 62 acres and persons directly related to McCarthy-Hicks, Inc. and the Profit Sharing Trust. As testified by plaintiff Skeen: "You could assume by common knowledge that it ["some land deal"] was connected with McCarthy-Hicks in some fashion, but what fashion I didn't know. . . . I didn't dig into it." When he did "dig into it" in 1977, he found nothing that he could not have found earlier if he had made the inquiries and sought the information that was available to him from the beginning. Although he "assumed" from "rumors" that the land was connected with the Profit Sharing Trust investments and

although he "was always interested in finding out," he said he never made any inquiries of anyone concerning the matter until after his retirement in 1977.

Where, as in this case, no fraud or lack of good faith is shown, the doctrine of laches may be more readily applied than otherwise. In *Hammond v. Hopkins,* 143 U.S. 224 (1891), in an opinion that has been quoted frequently by the Maryland Court of Appeals,[2] the Supreme Court of the United States said:

> "*In all cases where actual fraud is not made out,* but the imputation rests upon conjecture, where the seal of death has closed the lips of those whose character is involved, and lapse of time has impaired the recollection of transactions and obscured their details, the welfare of *society demands the rigid enforcement of the rule of diligence.* The hour-glass must supply the ravages of the scythe, and those who have slept upon their rights must be remitted to the repose from which they should not have been aroused." *Id.* at 274. (Emphasis added).

Under all the circumstances, we conclude that the chancellor erred in his implicit holding that the plaintiffs "exercise[d] that reasonable diligence which a court of equity requires to appear before it will interfere to enforce a claim thus situated." *McCoy v. Poor, supra.*

Although the fact that the defendants may have stood in the fiduciary relationship to the plaintiffs is a factor to be considered, in this case we do not think that factor, when considered with the other circumstances of the case, constitutes a justifiable excuse for the long delay in bringing this action. As said by the Court of Appeals in *Mitchell v. Cassedy, supra,* at 200 Md. 345:

> "In other words, the fact that a defendant stood in a fiduciary or confidential relationship to the

---

**2.** *See* Reeder v. Lanahan, 111 Md. 372, 388, 74 A. 575, 580 (1909); Dorsey v. Stone, 197 Md. 220, 224, 78 A.2d 757, 759 (1951); Mitchell v. Cassedy, 200 Md. 339, 345, 89 A.2d 620, 622 (1952).

complainant does not always constitute an excuse for delay. In *Hammond v. Hopkins,* 143 U.S. 224, 12 S. Ct. 418, 427, 36 L. Ed. 134, where it was alleged that trustees had entered into a fraudulent scheme to appropriate an estate, Chief Justice Fuller declared: 'Undoubtedly the doctrine is established that a trustee cannot purchase or deal in the trust property for his own benefit or on his own behalf, directly or indirectly. But such a purchase is not absolutely void. It is only voidable, and as it may be confirmed by the parties interested, directly, so it may be by long acquiescence or the absence of an election to avoid the conveyance within a reasonable time after the facts come to the knowledge of the *cestui que trust.*' "

## III

The defense of laches involves not mere unreasonable delay in asserting one's rights but also a showing of some prejudice to the defendants.

"Basic to the defense of laches is the need to show some disadvantage or prejudice to the party asserting it. . . . There must be either prejudice or circumstances making it inequitable to grant the relief sought." *Arundel Supply Corp. v. Cason,* 265 Md. 371, 376, 289 A.2d 585 (1972).

We think the record in this case clearly establishes not only that the defendants have been prejudiced by the long delay here involved but that, under the circumstances, it would be inequitable to grant the relief sought. The defendants are asked to turn back the clock to 1954 and return approximately a million dollars resulting from an investment that they in good faith considered perfectly proper. The transactions they entered into resulted in no harm, but a profit, to the Profit Sharing Trust. As stated in 30A C.J.S. Equity, § 118, pp. 67-68:

"*Change in value.* A marked appreciation or

depreciation, according to the circumstances, in the value of the property involved, where the right might have been asserted before such change, and the granting of relief would in consequence of the change work inequity, is ordinarily fatal to plaintiff's case. A person may not withhold his claim, awaiting the outcome of an enterprise, and then, after a decided turn has taken place in his favor, assert his interest, especially where he has thus avoided the risks of the enterprise."

In the final analysis, under all the facts and circumstances, we think the chancellor was clearly wrong and abused his discretion in not applying the equitable doctrine of laches in this case.[3]

> *Judgment reversed; case remanded with direction to the Circuit Court for Baltimore County to dismiss the proceedings; costs to be paid by original appellants.*

---

3. In view of this disposition of the case, it is not necessary to decide the other issues raised by the parties.