RISQUE W. PLUMMER, Individually and as Executor of the Estate of Nelle W. Murray *v*. A. CALVIN WASKEY et al.

[No. 67, September Term, 1976.]

*Decided February 1, 1977.*

The cause was argued before MOYLAN, DAVIDSON and MASON, JJ.

*Risque W. Plummer* and *Daniel B. Leonard* for appellant.

*William A. Fisher, Jr.*, with whom were *Semmes, Bowen & Semmes* on the brief, for appellees.

MOYLAN, J., delivered the opinion of the Court.

Nelle W. Murray died on August 13, 1975, at the Baltimore County General Hospital, where she had been taken two weeks earlier. She was 82 years of age. She had no children. The closest remaining relatives were second cousins.

On August 22, the appellant, Risque W. Plummer, who had been Mrs. Murray's lawyer for some 25 years, submitted for judicial probate a conformed carbon copy of a Last Will and Testament executed by the decedent on August 17, 1967, and a Codicil thereto dated July 22, 1973. In his petition for probate, Mr. Plummer stated that he had made a diligent search for the original of the aforesaid will and codicil thereto but was unable to find the original of either of said instruments. The conformed carbon copies were the copies that Mr. Plummer had retained in his files after he had prepared the aforesaid instruments. He prayed that he be appointed personal representative of the decedent's estate, since he was named as executor in the will.

In the will, Mrs. Murray made numerous bequests, including the bequest of her silverware and her diamond and pearl jewelry to the appellant's wife, Constance B. Plummer. She also provided that the rest, residue and remainder of her property and estate was to go to Mr. and Mrs. Plummer. In the codicil, Mrs. Murray revoked many of the cash bequests

she had made in her aforesaid will. The bequests to Mr. and Mrs. Plummer remained the same.

A hearing was held on the matter in the Orphans' Court of Baltimore County, at which the appellees as next of kin of Mrs. Murray appeared without counsel. None of them objected to the probate of the will. The sole issue before the court was whether the legal presumption of revocation which arose from the fact that the original will and codicil thereto had been in Mrs. Murray's possession and could not be found at the time of her death was rebutted by the evidence. The two judges of the court who heard the case were divided as to whether the presumption had been overcome and, therefore, probate was denied. This is an appeal from that order of the Orphans' Court.

On appeal, the appellant argues that the legal presumption of revocation had been rebutted by the evidence. We proceed, therefore, to recount the evidence as presented at the hearing.

The appellant, Risque W. Plummer, Esquire, had been the decedent's attorney for approximately 25 years. He first represented her in connection with the settlement of the estate of her stepmother, whose will left the house at 7308 Liberty Road, in which Mrs. Murray was living at the time of her death, and its contents to Mrs. Murray. During the next two decades, Mr. Plummer performed various other legal services for Mrs. Murray. He obtained a divorce for her from her husband, who had deserted her some 20 years earlier; to supplement her Social Security income, he legally invaded the principal of a trust estate established by her father; he drew numerous wills for her; he settled many small insurance claims. He also performed various personal services for the decedent, who had been deaf since childhood. (Everyone communicated with Mrs. Murray in writing; she, however, was able to speak.) He had a special telephone installed for her; he helped her get her Social Security; he had the assessment lowered on her house. Mr. Plummer testified that Mrs. Murray "ran me ragged, so to speak, for 25 years, and I never refused her and always made myself available to her . . . [W]hen she got to the point where she

couldn't get around too well I would go to her house and I have been there hundreds of times over 25 years. . ." He testified that since Mrs. Murray lived very frugally, he did not know that she had anything to compensate him with, so he charged her "very, very nominal" fees and in many instances none at all.

During the years, Mrs. Murray had a close relationship with both Mr. and Mrs. Plummer. She communicated with both of them on a regular basis, sending a card or a letter to them one, two or three times a week up until the time of her death. She would also call them on the phone frequently. Mrs. Murray always invited Mrs. Plummer to come with Mr. Plummer. Mrs. Plummer testified, however, that she did so only when Mrs. Murray really insisted and on special occasions like Christmas, Easter, Mrs. Murray's birthday, and several other times. She testified that she enjoyed a pleasant relationship with Mrs. Murray and that she was apparently the only person who could communicate orally with the decedent — Mrs. Murray was able to read Mrs. Plummer's lips.

Mr. Plummer testified that over the years he had drawn numerous wills for Mrs. Murray. In each of them, Mrs. Murray named him as executor. In the first will that Mr. Plummer prepared, Mrs. Murray named him as one of three residuary legatees; in the second will, he was named as one of two residuary legatees; and in the third will, he was named as the sole residuary legatee. Mr. Plummer testified that as time passed, Mrs. Murray developed a fondness for Mrs. Plummer and, as a result, in subsequent wills both Mr. and Mrs. Plummer were named as residuary legatees.

Because Mrs. Murray had named him as one of her beneficiaries, Mr. Plummer purposely referred her to outside counsel after he drew each will to make sure that she understood what she was doing and to have outside counsel examine her regarding her competency. In order to execute the two wills Mr. Plummer drafted for Mrs. Murray in 1953 and the one in 1955, he referred her to C. Keating Bowie, Esquire, who had an office in the same building as Mr. Plummer. Mr. Bowie examined Mrs. Murray on each

occasion to make sure that she understood the contents of
the will, that she was not influenced in any way in making
the bequests and that she was competent to execute the
instrument.

A letter from Mrs. Murray to Mr. Plummer dated
September 27, 1955, which Mr. Plummer had kept in his file,
was introduced into evidence. In the letter Mrs. Murray
stated that she did not want any "unpleasantness from my
various distant relatives" because she had mentioned Mr.
Plummer in her will. She suggested that Mr. Plummer
insert the following clause in the will:

> "For the help my attorney & executor has given me
> on numerous occasions, knowing I was alone and
> handicapped by loss of hearing I am remembering
> him in this will. He has never in any way tried to
> influence me in making any will — He knew
> nothing whatever of my plans until I gave him
> lists."

As to the wills Mr. Plummer drafted for Mrs. Murray in
1963, 1965 and 1967, he referred her to Richard H. James,
Esquire, another attorney in the same office building (Mr.
Bowie had moved to another office building). Mr. James
followed the same procedure as Mr. Bowie. At the time of
the execution of the codicil on July 22, 1973, Mr. Plummer
prepared and Mrs. Murray signed a statement, witnessed by
a Francis J. Fagan and Lucille M. Fagan, neighbors of Mrs.
Murray's who had also witnessed the codicil, stating that the
codicil expressed her wishes and that she fully understood it.

Mr. Plummer testified that he always gave the original of
each instrument, including the will and codicil in question,
to Mrs. Murray and kept a conformed carbon copy in his file.
Mr. Plummer told Mrs. Murray to put the instrument in a
safe place, such as her safe deposit box. He told her to
destroy the prior will whenever she had a new will drawn.
Mr. Plummer never asked Mrs. Murray, however, where she
put a will, although he stated that Mrs. Murray preferred to
keep all of her possessions around her, including articles
which should have been in the safe deposit box.

Before they moved to Florida in April of 1975, Lucille Fagan and her husband had been Mrs. Murray's neighbors for approximately 25 years. Mrs. Fagan testified that she and her husband on many occasions took care of Mrs. Murray when she was ill or otherwise needed them. When asked what the relationship between Mrs. Murray and Mr. Plummer was over the course of the 25 years, Mrs. Fagan stated:

> "[T]here never was anyone so attentive to a lonely old woman as Mr. Plummer. And I know this for a fact because I lived practically with Nelle. . . . [I]f Nelle's water came down her fireplace it was Mr. Plummer that she called. He — anytime, snow storm, she called him and she respected him. . . . [A]nytime that she needed anything she called Mr. Plummer."

The relationship between Mrs. Murray and Mr. Plummer was such that Mrs. Murray gave Mr. Plummer a general power of attorney in an instrument dated July 24, 1972. Mr. Plummer filed the instrument with the Maryland National Bank, Woodmoor Branch, where the testatrix had accounts and a safe deposit box. In his letter transmitting the power of attorney to the bank, he stated that it was to be used in case of an emergency.

The close and amicable relationship between Mrs. Murray and Mr. Plummer, however, changed shortly before her death. In the summer or fall of 1974, Mrs. Murray asked Mr. Plummer if he knew of a broker, since her broker had gone out of business, who could help her with stock transactions. Mr. Plummer suggested his son, Randolph (Randy), a registered broker with Kidder-Peabody & Company. Mrs. Murray made approximately five stock purchases through Randy from November 8, 1974, through February 26, 1975. In April of 1975, Mrs. Murray began writing to Mr. Plummer and Kidder-Peabody, however, complaining that she had not received one or two of these

securities. In her letter to Mr. Plummer of May 16, 1975, she wrote, in pertinent part:

> "With you and Connie main beneficiaries in my will, am trying to leave as much as possible to pay you for the help you have given me. (I know C. doesnt understand this). But I can assure you, it is true. Am trying to leave the property in as good condition as possible to bring a good price."

Mr. Plummer testified that Randy immediately expedited delivery of these securities to Mrs. Murray. Mrs. Murray, however, continued to worry about the securities and complained about not receiving her cancelled checks, with which she had paid for the securities. On June 18, 1975, Mr. Plummer and his son went to see Mrs. Murray. They found that she had in fact received all of the stock certificates and all of the cancelled checks.

Mr. Plummer testified further that Mrs. Murray then became angry with the Maryland National Bank, Woodmoor Branch, thinking that they had her stock certificates. On June 27, she had Mr. Plummer open an account for her at the Union Trust Company and gave him a limited power of attorney over that account. She then gave Mr. Plummer the keys to her safe deposit box at Maryland National and had him close out her accounts and the safe deposit box, pursuant to the general power of attorney given him in 1972. Mr. Plummer gave Mrs. Murray the contents of the safe deposit box. In a letter to the Maryland National Bank, Woodmoor Branch, postmarked the evening of July 28, 1975, the night Mrs. Murray was taken to the hospital, but dated August 3, 1975 (Mrs. Murray, Mr. Plummer testified, was a week ahead of herself during the latter months of her life), Mrs. Murray complained that all of her stock certificates were not in the contents of the safe deposit box. In the letter she stated that Kidder-Peabody wrote her that all stock certificates were sent to the Maryland National Bank but that the Baltimore Gas & Electric and the Ohio Edison stock certificates were not in the contents of the safe deposit box

that Mr. Plummer had closed out. A portion of the letter stated:

"... The atty I had at that time should have collected them along with contents of safety box but made no mention of them. He seemed very stupid & I am too old & so very ill. I must have some peace the rest of my life. He kept the last will I had made. Tho he never had full power of atty only limited. I have never once given any one full p. of atty. . . .

If he showed you any full p. of atty it was evidently forged."

When questioned by the court whether he had any falling out with the decedent or whether there was any dissension that occurred during the last few months of her life, Mr. Plummer stated:

"None to my knowledge, if Your Honor please. She apparently got — she began going down hill very rapidly toward the end there. She was either 82 or in her 82nd year. The death certificate and the hospital records mention senility as one of her problems at the time. As her condition worsened then to me it seemed as if she became mad with the world and everybody connected with it. And I can assure Your Honor that I never knowingly did anything to offend her, anything other than to try to assist her with her problems. But this unfortunate incident about she not thinking that she had received her stock certificates and cancelled checks, in thinking that the bank had something to do with it or that I should have gotten them for her under my power of attorney. She, in her late confusion, just before she died she did apparently get mad with me at that time, but if she destroyed her will, which I do not think she did, she certainly did not know what she was doing and could not possibly, in my judgment, have had the capacity to appreciate what she did at that time. And I think

her doctor will indicate as much if he, if Your Honor wants to hear any medical testimony."

The month before she died, Mrs. Murray wrote several letters to John Kepler Knight, a second cousin and one of the appellees herein. In many of the letters she expressed her distrust of Mr. Plummer. In early July, Mrs. Murray wrote her cousin that she would send him a "restricted" power of attorney. Mr. Plummer subsequently prepared the power of attorney, but the form was never executed. On July 20, Mrs. Murray wrote to Mr. Knight:

> "What did P [Plummer] tell you when you called him? Just afterward he wrote me he would bring his secretary here & give *her* the Power of atty which shows he is determined to grab everything & you would get nothing whether you want the job or not. That shows all too plainly how little he is to be trusted. I've never liked him even a little bit but didn't know who to get & had to have someone because Myra's 1st husband's people were so bad.
>
>  . . .
>
> You should see the nutty letter came from P this Am. All, the bunch of LIES!
>
> Of course I'll Ignore it.
>
> Nelle"

Mr. Plummer explained below that his secretary was a Notary Public and was going over to Mrs. Murray's home merely to notarize the power of attorney.

On July 23, Mrs. Murray wrote to Mr. Knight:

> "I suppose its easy to be having been impressed after talking to P once but I was not, & have always regretted not having asked the Trust company to recommend some one else after all the worry and misery he has caused me in the past over 14 [sic]

years. Please, as a blood relative, do not tell him I was thought to be dying. He wrote me not long ago that he would bring his secretary here and give her the power of atty! My God! the last thing I need is two of him so I ignored it. And that in spite of your being so close & whether or not you are interested. I am really afraid of that guy since he has so little scruples. Protect me if you can.

. . . He's practically away most all of the time & the farther away the better it suits me. He's just a complete conceited egoist. If he comes here I will not admit him. Never know what he will do and he has no right to force himself on me. Please don't mention anything to him about lawyers referral service or he'd try to start something right away. Of course you don't know him like I do. Nor do your friends who are attys. Remember my experience has been over 14 [sic] years!

Never forget that in spite of all his smooth talk.

And I do not lie.

Nelle"

Mr. Knight testified that during the last few months of Mrs. Murray's life, he visited her about once a week. Mrs. Murray told Mr. Knight that she knew her health was failing and that she could die at any time. As late as two to three weeks before she was taken to the hospital, Mrs. Murray had told Mr. Knight that Mr. and Mrs. Plummer were the beneficiaries of her will.

On the Saturday prior to Mrs. Murray's going to the hospital, when asked by Mr. Knight where the will was, she replied that Mr. Plummer had it. Mr. Knight testified that on that particular Saturday, she was mentally competent and fully understood both the question and answer. Mrs. Murray sought Mr. Knight's advice regarding another lawyer. She indicated to Mr. Knight that she was fearful Mr. Plummer would be out of town when she died and that she

would like to make some changes in her will. Mr. Knight on that occasion communicated with Mrs. Murray by writing. The writings appear in the record. Mr. Knight wrote, in pertinent part:

> "If you want to drop Plummer, here's what you'll have to do:
>
> Notify him and pay him any fee you owe him.
>
> Then you must draw a new will. Once the new will is made and signed and witnessed — Plummer will be out of the picture. You will also have to cancel his Power of Attorney."

Mr. Knight recommended another attorney to Mrs. Murray and told her he would bring him to see her. He told Mrs. Murray to write down what she wanted in the new will.

On Monday, July 28, 1975, Mr. Knight and William A. Fisher, Jr., Esquire, of the law firm of Semmes, Bowen & Semmes, went to see Mrs. Murray. When they arrived, Mrs. Murray, however, was lying on the floor in the hallway — she had had one of her "falling spells." She was very distraught, unorganized and irrational and was unable to conduct any business. As a result, after Mr. Knight saw that Mrs. Murray was alright sitting on the sofa, he and Mr. Fisher left. Mr. Knight testified that Mrs. Murray frequently would have these spells but would "snap out" of them. That night at about 1 a.m., Mr. Knight received a call from a neighbor of Mrs. Murray's indicating she had been taken to the hospital.

Mrs. Murray was admitted to the Baltimore County General Hospital during the early morning hours of July 29, 1975, suffering from possible cerebrothrombosis, hemi-paresis of the left side, arteriosclerotic heart disease, chronic heart failure, dehydration, and senile dementia. She died on August 13, 1975.

On the Saturday following Mrs. Murray's death, Mr. Plummer and his secretary met with Mr. Knight at Mrs. Murray's home. Mr. Knight had the key to the house. Mr. Knight gave Mr. Plummer a manila folder containing a number of securities. Upon searching the house, they found

other securities in an old refrigerator. They were unable, however, to find the will or codicil in question. They met again at the house on the next morning. At this time, they found the securities Mrs. Murray had purchased through Kidder-Peabody. The securities were under a blanket on the seat of a chair in the dining room where Mrs. Murray had always sat. During the course of this and further searches, however, there was no trace of the will and codicil. When asked at the hearing to explain what, in his opinion, might have happened to the will and codicil, Mr. Plummer stated, "[T]he will is either still somewhere in that house or it has been removed by someone whose identity I could not assess."

Where it is shown that a will or codicil was in the maker's possession and custody but cannot be found at the time of death despite a diligent search, a rebuttable presumption arises that the maker of the instrument destroyed it animo revocandi. *Measley v. Housman,* 144 Md. 339, 124 A. 906; *Gilbert v. Gaybrick,* 195 Md. 297, 73 A. 2d 482; *Tilghman v. Bounds,* 214 Md. 533, 136 A. 2d 226; *New York Library Assn. v. Atwater,* 227 Md. 155, 175 A. 2d 592. The burden to prove the contrary was on the appellant, who sought to probate the conformed carbon copies. *Gilbert v. Gaybrick, supra,* at 195 Md. 396; *New York Library Assn. v. Atwater, supra,* at 227 Md. 157.

This presumption may be overcome by various evidence. In speaking of the ways in which this presumption may be rebutted, 95 C.J.S., *Wills,* § 385, at 285-287, states:

"Whether the presumption be regarded, as it has been by some authorities, as one of law, or, as by others, as one of fact, a question which, it has been pointed out, is not material as far as the burden of adducing evidence to the contrary is concerned, it may be rebutted by circumstances which tend to show a conclusion to the contrary, as by showing the absence either of destruction of the will before the testator's death or of intention to revoke, or by proof that the will was lost or destroyed before his death without his consent, or that it was destroyed by accidental means or some unauthorized agency.

> Furthermore, the presumption may be rebutted by proof of the circumstances of the testator or of his relation to persons involved, by evidence of his acts or declarations, or by evidence showing existence of the will at a time when the testator was incapable of revoking it, as by evidence that the testator was mentally incapacitated to revoke it and that he never thereafter regained the mental capacity essential to a revocation, or by showing that he did not have possession of the will after its execution, or access thereto, or that he had no opportunity to revoke. In such event, the courts are justified in concluding that the presumption has been rebutted, it being unnecessary to determine what happened to the will. Whether the presumption has been overcome depends on whether the evidence shows that it is unlikely that the testator destroyed his will, and the presumption that the testator did not intend intestacy may be considered to rebut the presumption."

The appellant argues that Mrs. Murray made statements up until the time of her last attack on July 28 indicating that she had not revoked the will but that the will was still in existence. He refers to her statement in the letter to him written by Mrs. Murray on May 16, 1975, regarding the stock purchased from Kidder-Peabody where she acknowledged that Mr. and Mrs. Plummer were her main beneficiaries and that she was only sorry that she could not leave them more; to her statement in the letter written to the Maryland National Bank on July 28, the day she had her last attack, indicating that Mr. Plummer "kept the last will I had made"; and to her statement to Mr. Knight on July 26 when she indicated that Mr. Plummer had the will. The appellant argues that though Mrs. Murray mistakenly believed that Mr. Plummer had the will in question that her statements, nevertheless, indicate that she did not revoke her will.

The declarations of a testator, made shortly before death or at a time when he is physically unable to revoke a will, that his will is still in existence are admissible to rebut the

presumption of revocation arising from the fact that the will cannot be found after his death. 3 Page, *Wills* (Bowe-Parker Rev. 1961), § 29.146; Annot., *Proof of nonrevocation in proceeding to establish lost will*, 3 ALR2d 943; *N.Y. Library Assn. v. Atwater, supra.* Although Mrs. Murray's statement in her letter of May 16 to Mr. Plummer indicated that the will had not been revoked at that time, the statements she made in July indicating that Mr. Plummer had her will are unclear, ambiguous and equivocal.

Mr. Plummer testified that Mrs. Murray was an intelligent and well-informed woman. He testified that he always gave Mrs. Murray the original of each will that he drafted for her. The only original will Mr. Plummer had in his possession at the time of Mrs. Murray's death was the 1963 will. Mrs. Murray had made numerous handwritten notations on the original of that will and brought it to Mr. Plummer when she decided to execute the next will. Mr. Plummer had retained the original of the 1963 will in his file together with conformed carbon copies of all of the other wills. The Court questioned Mr. Plummer:

"(The Court) All right. When you saw this attached to her will, when you saw this change and there were other markings and another piece of paper, did you advise Mrs. Murray of the law regarding wills and what happens to them when there are changes made and what happens if you can't find an original?
A. Yes.

(The Court) Did you discuss all—
A. I am sure I did.

(The Court) —testamentary law with her?
A. In all the wills I had prepared for her over the years she knew precisely.

(The Court) Did she know that if the original executed copy of a will could not be found that there was a danger of not having a will probated?
A. I don't know that I ever specifically went into detail with her about that, but she was a very

knowledgeable person. I had discussed the law with her many times and she would always come to me for these changes. I would prepare the will, give it to her to keep. She had a safe deposit box, I would tell her to be sure to put it in some safe place. I never pried into her affairs. I never asked her where she had put it or where she had kept it, anything of that sort, but she always took it with her. I put it in an envelope and gave it to her."

The appellant argues further that the will embodied Mrs. Murray's testamentary scheme held since the early 1950's — that her second cousins should not inherit her property — and that she knew that this would be the result if she revoked the will without making a new will. The evidence indicated overwhelmingly, however, that Mrs. Murray, shortly before her death, was contemplating making a new will. She solicited Mr. Knight's advice regarding another attorney. The evidence indicated that Mrs. Murray and Mr. Plummer had a falling out. Although there was senility at the time of Mrs. Murray's death, the evidence indicated that there were periods in July of 1975 when she was mentally alert.

"It is said that the evidence which rebuts [the] presumption [of revocation] must be clear and satisfactory, or that it must exclude every presumption of revocation by the testator. It is said that strong proof is necessary, which means more than a preponderance of evidence, and less than proof beyond a reasonable doubt." 3 Page, *Wills* (Bowe-Parker Rev. 1961), § 29.142, p. 706. The appellant's reliance on the ambiguous statements of Mrs. Murray made shortly before her death and on a testamentary scheme held before her falling out with him obviously was not persuasive enough to convince both of the fact finders that the presumption of revocation was rebutted. The burden of persuasion was upon the appellant and we cannot say that the Orphans' Court was in error as a matter of law because they were not so persuaded.

The appellant makes the claim that the presumption was

improperly used and that the burden of persuasion was not properly upon him. He seeks to rely upon the treatment given to presumptions by our case of *Evans v. State*, 28 Md. App. 640, 349 A. 2d 300, applying constitutional principles laid down by the Supreme Court in *Mullaney v. Wilbur*, 421 U. S. 684, 95 S. Ct. 1881, 44 L.Ed.2d 508 (1975), and *In Re Winship*, 397 U. S. 358, 90 S. Ct. 1068, 25 L.Ed.2d 368 (1970). We there held that in the criminal law the only legitimate presumption is one in the Thayer-Wigmore tradition which shifts to the party against whom the presumption operates only the burden of producing evidence and not the ultimate burden of persuasion. That type of presumption — merely shifting the burden of going forward — is dissipated (the bubble bursts) whenever the evidence to the contrary is sufficient to generate a genuine jury issue. Only this type of presumption may operate in the criminal law because the due process clause, according to *Winship* and *Mullaney v. Wilbur*, does not permit the ultimate burden of persuasion to be shifted to a criminal defendant on any issue.

This due process limitation on the operation of legal presumptions, however, does not operate in the civil arena. There, unhindered by the due process clause, the burden of ultimate persuasion as well as the burden of producing evidence may be allocated to either party on any particular issue as the emerging common law deems appropriate and fair. A presumption in the other tradition — the Morgan tradition — that remains in the case and that does not disappear like the bursting bubble is appropriate in the civil law. In our *Evans* opinion, we were careful to point out this distinction in footnote 40:

> "*Mullaney v. Wilbur's* reliance upon and indebtedness to the profound analysis of Fletcher, *Two Kinds of Legal Rules: A Comparative Study of Burden-of-Persuasion Practices in Criminal Cases*," 77 Yale L.J. 880 (1968), is apparent when the Supreme Court opinion and the law review article are read side by side. Professor Fletcher demonstrates convincingly that there are two

distinct sets of rules and procedures at work in our law — 'the model set by private litigation' and 'the model focusing on the justification for invoking criminal sanctions' — and that much of our present-day confusion resulted from the tendency of 19th century jurists falsely to analogize the latter to the former. . . .

What emerges is that the use of a presumption in the Morgan tradition may remain perfectly appropriate for civil litigation, where burdens even of ultimate persuasion may shift back and forth throughout the course of a trial. It is not inappropriate in such civil litigation to require a person asserting a position to bear the burden of proving that position. 'The proponent of an issue bears the burden of that issue.' Nor is it inappropriate to adjust the burden of persuasion where facts are 'peculiarly within the knowledge' of one of the parties. McCormick, *Evidence* (1954), at 675. Such a tradition, however, is not appropriate as a model for the criminal law. . ."

The presumption of revocation in this case is in that Morgan tradition of presumptions. It did not shift to the appellant a mere burden of going forward and producing some evidence that the will was still in existence, upon the production of which the presumption would be totally dissipated. It rather shifted to him the fuller burden of ultimate persuasion — the risk of nonpersuasion — on this issue. The presumption remained in the case unless and until he persuaded the fact finder that it was rebutted. His was the burden of persuasion and he failed to persuade. Nothing we said in *Evans* by way of limiting the type of presumption available in the criminal trial had any erosive effect upon this very different type of presumption which may operate, and does operate, in the civil law.

*Judgment affirmed; costs to be paid by appellant.*