708 A.2d 1140

**Debra OLIVER et al.**

v.

**William D. HAYS, Personal Representative of
the Estate of Doris Elizabeth Showe.**

**No. 1392, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

May 4, 1998.

William McC. Schildt (Strite and Schildt, P.A., on the brief), Hagerstown, for appellants.

Thomas A. Wade, Hagerstown, for appellee.

Before MOYLAN, HOLLANDER and EYLER, JJ.

HOLLANDER, Judge.

In this case, we must determine whether Doris Elizabeth Showe died intestate as a result of a valid revocation of her

Last Will and Testament.[1] Although Ms. Showe's will provided for the distribution of the remainder of her estate to her two stepdaughters and her son, the decedent's son will inherit her entire estate if the revocation was valid. Consequently, the controversy before us pits the decedent's son, who contends that his mother effectively revoked her will, against the decedent's stepdaughters, who urge us to conclude that the revocation was invalid.

On May 10, 1996, William D. Hays, appellee, filed a petition in the Orphans' Court for Washington County, requesting administrative probate and his appointment as personal representative of the estate of his mother, Doris Showe, who died on May 6, 1996, allegedly without a will. Shortly thereafter, Showe's stepdaughters, Denise Curtis and Debra Oliver, appellants, filed a petition for judicial probate of a lost or concealed will. Following a hearing on November 1, 1996, the orphans' court found that, at the time of her death, Showe had revoked all prior wills.

Appellants timely noted an appeal to the Circuit Court for Washington County and, after a trial *de novo* on July 1, 1997, the court found that Showe died intestate, having lawfully revoked all previous wills. Appellants timely noted this appeal, and present the following questions for our review:

I. Did the trial court err in concluding that revocation of Doris Showe's will by destruction could be proved solely by the testimony of a person benefitting from the revocation?

II. Did the trial court err in concluding that the proponents of Doris Showe's will had the burden of proving her lack of capacity to revoke the will?

III. If the proponents of Doris Showe's will did have the burden of proving her lack of capacity to revoke the will, did the trial court err in finding that Doris Showe did not lack capacity?

---

1. Doris's age at the time of death is not reflected in the record. Nor does the record provide any indication as to the value of her estate.

IV. Did the trial court err in admitting in evidence the written statement of Doris Showe purporting to invalidate her will?

For the reasons that follow, we shall affirm.

### Factual Background

Doris Showe married Max Showe in 1978. It was the second marriage for both, and each had offspring from their prior marriages. Doris Showe's only child, William, is the appellee herein. Max's two daughters, Denise Curtis and Debra Oliver, are the appellants.[2]

On February 7, 1992, Doris and Max executed "mirror wills," in which each left his or her entire residuary estate to the surviving spouse. Each will also included several specific bequests, but these were to take effect only in the event that the spouse predeceased the testator or testatrix, or they died together, or they died within 60 days of each other. Of particular significance here, each will also provided that if the spouse did not survive the testator or testatrix, the remainder of the estate, after distribution of the specific bequests, would pass as follows: one-half to appellants and one-half to appellee.

In July 1994, while Max was still alive, Doris suffered a debilitating stroke that left her paralyzed on the right side of her body. As a result, she was unable to care for herself and could not perform many routine functions. The stroke also affected Doris's speech, so that she was only able to utter a few words. In addition, it appeared that Doris was unable to recognize at least some people with whom she had been familiar for many years. The extent to which her cognitive abilities were affected, however, is a matter of dispute.

Max died on June 21, 1995, leaving his estate to Doris.[3]

___

**2.** Max also had a son, Steven Showe, who is not a party to these proceedings. Max's will included a specific bequest to Steven, but only in the event that Doris predeceased Max.

**3.** The record does not reflect either the value of Max's estate or the amount of money that Doris inherited from him. Nor do we know Max's age at the time of his death.

Thereafter, appellee located Max's will in a bank safe deposit box. Max named appellee as a personal representative of Max's estate in the event that Doris predeceased Max or was otherwise unable to serve. During his search for Max's will, appellee located his mother's will, dated February 7, 1992. According to appellee, he removed his mother's will from the safe deposit box and took it to his residence in Pennsylvania.

Appellee explained at trial that he subsequently reviewed Doris's will with her, reading it to her aloud, and she "indicated that that was not what she wanted." Appellee also claimed that he discussed with his mother whether she was aware that by destroying the will "everything would come to me." According to appellee, he then consulted a lawyer in Pennsylvania about having the will declared void. Appellee recounted that the lawyer told him "to draw a piece of paper up saying that [his mother] no longer wished to have this will and have it witnessed by two other people and she would sign that ... and the will would be destroyed if she directed me to."

On September 10, 1995, appellee followed the lawyer's instructions. He drafted a document that read:

I, DORIS SHOWE, AS OF 10 SEPT 1995 DECLARE THIS WILL DATED 7 FEB 1992 AND ALL PRECEDING WILLS TO BE INVALID.

The document is typewritten except for the dates, which are hand printed. Below the text, the name "DORIS E. SHOWE" is typed next to a signature line. A handwritten mark that resembles the letter "X" or the letter "T," tilted at a 60 degree angle to the left, appears on the signature line. Below the signature line there are two witness signatures: Sandy Tressler and Juanita V. Smith, both of whom were daycare providers for Doris. Tressler cared for Doris between June 1995 and February 1996, working approximately 12 hours per day, three days per week. She testified at trial, but Smith did not.

At trial, appellee related the following as to the events of September 10, 1995:

[APPELLEE]: I arrived at the house that morning and my mother was there and my wife and daughter was with me

and one of the caretakers was there. I asked the caretaker if she would remain. They were getting ready to change shifts. Another was coming in to take her place. I asked . . .

[APPELLEE'S COUNSEL]: What was that person's name?

A: Uh, Sandy Tressler and the other lady was named Juanita Smith.

Q: Okay. They were present. What happened?

A: I took the will to my mother and reviewed it with her and asked her if this was the will she wanted and the way it was written is what she wanted. She indicated, no. She said, "No." I said, "Okay. Do you want me to destroy this will?" She nodded yes. I said, "I have a piece of paper drawn up here that you will initial and the two ladies will witness it and when that is done, I will destroy the will. Is that what you want?" She said . . .

Q: What did you see your mother do?

A: She made her mark on the piece of paper. The two ladies signed as witnesses and the will was destroyed.

Q: How was the will destroyed?

A: The will was torn.

Q: Who tore it?

A: I did.

Q: Who told you to tear it?

[APPELLANTS' COUNSEL]: Objection, leading.

THE COURT: Overruled.

A: My mother told me to destroyed [sic] the will. She didn't tell me to tear it, she told me to destroy it. So I destroyed it by tearing it.

Q: Was that done in her presence?

A: Yes sir.

On cross-examination, appellants' counsel attempted to determine whether anyone witnessed appellee destroying the will:

[APPELLANTS' COUNSEL]: And you did not tear it up in [the caretakers'] presence, did you?

[APPELLEE]: They were in the process of signing their names to this piece of paper.

Q: Well wait a minute, as they were signing their names, you tore up the will?

A: Yes.

Q: That's your testimony?

A: Yes.

Q: So they ... You are now saying they were physically present when you tore it up?

A: They were in the room, sir. They did not sign this piece of paper right in front of me. The one signed it. I think Sandy was sitting over at the bar. The piece of paper was then taken over to her for her to sign and while that was transpiring, I tore the will up.

Q: But neither of them saw you do it, is that right?

A: Not to my knowledge.

Q: But yet you're now saying they were physically in the room?

A: I said that before sir.

Q: Well, alright, I understood you to say, they were ... you didn't know. But it's your testimony now that they were physically in the room when you tore up the will?

A: Yes.

Q: When you read the will to your mother, did you ask her any questions to determine that she understood what you were reading?

A: I asked her if she knew this was her will? She nodded yes.

Q: Well did you ask her anything about what you had read to her to determine that she knew what you were reading?

A: I asked her if I[sic] knew this was her will.

Q: I understand. I take it from that, you did not ask any questions to determine whether she understood the meaning of the words in the will?

A: No sir.

Appellants' counsel then objected to the admissibility of the document on the ground that it constituted hearsay evidence. The court overruled the objection and admitted the document.

In her testimony, Tressler asserted that, despite being paralyzed on the right side, Doris was able to use her left hand to put puzzles together and to hold utensils to feed herself. In addition, Tressler stated that Doris was able to utilize her left hand to go through pages of the newspaper; she would then point to food items that she wanted for dinner. Although Doris's vocabulary was primarily limited to the words "yes" and "no," Tressler testified: "Doris comprehended fairly well. She could not communicate verbally due to the fact of her stroke, but she had other ways of communicating." Tressler also said:

The people that were close to [Doris] she knew. She could say their names. She recognized them. She was comprehensive, very comprehensive. Due to her stroke, she would get frustrated because she couldn't communicate as well.

Further, Tressler recounted that she observed Doris when she made a mark on the document indicating that she was revoking her will. The following colloquy is relevant:

[APPELLEE'S COUNSEL]: Okay is there any ... any doubt in your mind that she was incapable of indicating something by making her mark on that paper?

[APPELLANTS' COUNSEL]: Objection.

THE COURT: Overruled.

[TRESSLER]: No sir.

Q: Why not?

A: Doris understood what was being said to her.

Q: And why do you say that?

A: Uh, from working with Doris (pause) she, I guess, from working with Doris, when I would ask her something, you

know, she would say "yes" or "no", you know, or communicate some way.

Under cross-examination, Tressler admitted that she did not see the will and did not observe appellee tearing up anything at or around the time Doris placed her mark on the document.

Tressler's testimony stands in stark contrast to that of Alta Martin, a former caretaker for Max and Doris who testified for appellants. Martin began working for the couple in February 1995 and, following Max's death, she continued to care for Doris until November 1995. During this period, Martin said she worked between eight and eighteen hours per day, seven days a week. After Max's death, she took care of Doris at night, and Doris was awake all night long. The following exchange is pertinent:

[APPELLANTS' COUNSEL]: Alright. Was Mrs. Showe able to write?

[MARTIN]: No. No.

Q: Could she hold a writing instrument?

A: No, nothing to write. We even had to feed her.

Q: Alright. And did you have any way of telling that her hearing wasn't impaired? I mean, do you know that she could hear?

A: Well I think she could hear. I think she could hear alright, pretty much.

Q: On what do you base that conclusion?

A: It's been two years, you remember.

Q: I understand.

A: I think she could hear, but as far as her mental capacity, that stroke affected her ... her mind as well as her sight and her speech and her right side.

\* \* \* \*

Q: U'm, in your opinion, did Mrs. Showe in the period of August or August and September of 1995, did she have the capacity to understand and execute a will?

A: No sir.

[APPELLEE'S COUNSEL]: Objection.

THE COURT: I'm going to overrule the objection.

Q: Your answer, I'm sorry.

A: No sir, she did not have the capacity.

Q: And can you explain why you say that?

[APPELLEE'S COUNSEL]: Objection.

THE COURT: Overruled.

\* \* \* \*

A: She just . . . She just didn't have the capability. That was it. You know, she just wasn't capable of understanding anything as far as in my opinion.

Q: Was there any level, other than a will, that you in your opinion, she comprehended or understood?

A: No.

The testimony of Hope Schrader, Max's sister, was consistent with Martin's testimony. Schrader said that from the time that Doris returned home after her stroke in September 1994 until Max was hospitalized in May 1995, she would visit the couple every Saturday and clean their house for them. Although she acknowledged that Doris could turn the pages of a book, Schrader maintained that "she wouldn't know what she was looking at." Schrader also claimed that she would try to talk with Doris, but Doris "couldn't respond to anything with words." After Max's death, Schrader said she visited Doris in August 1995 and again around Christmas. In her opinion, in August and September of 1995, Doris did not have the capacity to execute or understand a will. She also stated:

> . . . I think if you read something to her, she might just sit there like she was listening, but she couldn't comprehend it. And like I said, mentally Doris would not have known, no. I have an opinion that she would be, like I said, a preschooler. Cause I worked with the mentally ill and handicapped people for 17 years of all ages and Doris would come under a preschooler, in my opinion.

Upon further questioning, it was revealed that Schrader's work with the disabled involved assisting them in getting on a

school bus and ensuring that they did not impede the bus driver's ability to get them to school.

Appellant Curtis also testified. In the eleven months between Doris's stroke and her father's death, Curtis visited the couple less than once every other month. When she did visit, she did not believe that Doris recognized her. Moreover, whenever Curtis attempted to converse with Doris, her stepmother would try to speak, but Curtis could not understand her. Curtis also said she did not know if Doris understood her. After her father's funeral in June 1995, Curtis never saw or spoke to Doris.

Neither side produced any medical records as to Doris's physical or mental condition. Nor was any expert testimony presented by the parties.

At the conclusion of the evidence, the court orally announced its findings of fact and conclusions of law. Finding a valid revocation of the will, the court stated:

> The Court would find that there was a satisfaction of the statute by the acts of Mr. Hays with the consent of and at the direction of his mother. Now [appellants' counsel] is correct in his argument that the court or trier of fact should look at his testimony with great concern because he is the one who will be the beneficiary of a revocation and he is the son and he had no corroboration of the tearing [of the will]. And I did. You know, I view his ... You know, I watched him. It is a matter of weight. And notwithstanding the scenario that may have occurred, I find that the burden of persuasion has been met by the testimony and evidence presented that there was a revocation as the statute requires.
>
> Now the issue, though, is ... a sub-issue is that of capacity. Having found that the tearing occurred and the destruction occurred in the presence of Mrs. Showe, was the revocation, again, with her consent and here we have the matter did she have the capacity to understand, and did she understand, by necessarily then consent, did she have the capacity to understand what was ... what was happening?

Now as I indicated when we have a contest to a Last Will and Testament and the capacity of the testator or testatrix, the burden is on the party who is attacking that will to prove the incapacity. I am not certain whether that burden by law is applicable here where one is attacking revocation. It probably is not because of the terminology of the statute which has to have the revocation at the direct ... direction or expressed direction and consent. But in any event, I'm not convinced that she was incapable mentally, even though she had her problems and they are ... were great. I'm not convinced that she was incapable of understanding the consequences of her revocation. Again, Mr. Hays says that he explained to her, on several occasions. First occasion and then on the date in September, what the consequences of these actions would be in that he would be the sole heir of her estate. Regardless of who has the burden, and that's a legal matter, *from all of the evidence, I would find that she was capable. That she had the capacity to understand. She had the capacity to consent, understood the consequences of placing her mark upon the document and understood the consequences of the eventual destruction of the prior will.*

The bottom line then is that this Court would find as a fact and law that there was a valid revocation of the 1992 Last Will and Testament of Doris Showe and the estate would proceed intestacy.

(Emphasis added). We will include additional facts in our discussion.

### Discussion

### I.

■ As this case was tried before the circuit court without a jury, our standard of review is governed by Maryland Rule 8–131(c), which states:

When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the

evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

*See Nicholson Air Servs., Inc. v. Board of County Comm'rs,* 120 Md.App. 47, 66–67, 706 A.2d 124 (1998); *In re Joshua David C.,* 116 Md.App. 580, 592, 698 A.2d 1155 (1997) ("Indeed, we accept the facts as found by the hearing judge, unless clearly erroneous."); *State v. Johnson,* 108 Md.App. 54, 70–71, 670 A.2d 1012 (1996). When the trial court's findings are supported by substantial evidence, the findings are not clearly erroneous. *Ryan v. Thurston,* 276 Md. 390, 392, 347 A.2d 834 (1975); *Sea Watch Stores Ltd. Liab. Co. v. Council of Unit Owners,* 115 Md.App. 5, 31, 691 A.2d 750, *cert. dismissed,* 347 Md. 622, 702 A.2d 260 (1997). "Therefore, if 'competent material evidence' supports the trial court's findings, we must uphold them and cannot set them aside as 'clearly erroneous.'" *Johnson,* 108 Md.App. at 71, 670 A.2d 1012 (quoting *Nixon v. State,* 96 Md.App. 485, 491–92, 625 A.2d 404, *cert. denied,* 332 Md. 454, 632 A.2d 151 (1993) (internal quotations omitted)).

We also underscore that we may not substitute our judgment for that of the fact finder, even if we might have reached a different result. Instead, we must "decide only whether there was sufficient evidence to support the trial court's findings. In making this decision, we must assume the truth of all the evidence, and of all the favorable inferences fairly deducible therefrom, tending to support the factual conclusions of the lower court." *Mercedes–Benz v. Garten,* 94 Md.App. 547, 556, 618 A.2d 233 (1993); *see also Johnson,* 108 Md.App. at 71, 670 A.2d 1012.

The clearly erroneous standard does not apply to the trial court's conclusions of law, however. *In re Michael G.,* 107 Md.App. 257, 265, 667 A.2d 956 (1995); *Bagley v. Bagley,* 98 Md.App. 18, 34, 632 A.2d 229 (1993), *cert. denied,* 334 Md. 18, 637 A.2d 1191 (1994). Pure conclusions of law are not entitled to any deference. *Jensen v. Jensen,* 103 Md.App. 678, 687, 654 A.2d 914 (1995). Rather, our review of conclusions of

law is expansive. *In re Michael G.,* 107 Md.App. at 265, 667 A.2d 956. With respect to the lower court's application of the law to the facts, we apply the abuse of discretion standard. *Pierce v. Montgomery County,* 116 Md.App. 522, 529, 698 A.2d 1127 (1997).

## II.

■ Generally, "[t]he law disfavors intestacies and requires that, whenever reasonably possible, wills be construed to avoid that result." *Kroll v. Nehmer,* 348 Md. 616, 625, 705 A.2d 716 (1998) (discussing the doctrine of dependent relative revocation). Nevertheless, "the law's preference for a testate disposition is always subordinate to the intention of the testator, whether ascertained or presumed." *Id.*

■ The absence of a will that has been traced to the possession and custody of the testator raises a rebuttable presumption that the will has been destroyed by the testator, *animo revocandi. New York State Library Sch. Ass'n v. Atwater,* 227 Md. 155, 157, 175 A.2d 592 (1961); *Tilghman v. Bounds,* 214 Md. 533, 537–38, 136 A.2d 226 (1957); *Gilbert v. Gaybrick,* 195 Md. 297, 306, 73 A.2d 482 (1950); *Preston v. Preston,* 149 Md. 498, 520, 132 A. 55 (1926); *Plummer v. Waskey,* 34 Md.App. 470, 481, 368 A.2d 478 (1977). Once the presumption arises, the party seeking to probate a copy of the will ordinarily has the burden of explaining what became of the original. *Atwater,* 227 Md. at 157, 175 A.2d 592. But a person last known to be in possession of the will has that burden if that person stands to benefit, directly or indirectly, by receiving the decedent's property through intestacy. *Tilghman,* 214 Md. at 538, 136 A.2d 226; *Plummer,* 34 Md.App. at 481–82, 368 A.2d 478; *see also Safe Deposit & Trust Co. v. Thom,* 117 Md. 154, 162, 83 A. 45 (1912).

■ Here, it is undisputed that appellee was the last person to have possession of Doris's will. It is also uncontroverted that if Doris died intestate, her entire estate would pass to appellee. Therefore, appellee had the burden of explaining what happened to the will. Appellee avers that the

testatrix revoked her will when she instructed him to tear it. Maryland Code (1974, 1991 Repl.Vol.), § 4–105 of the Estates & Trusts Article ("E.T."), which pertains to revocation, is pertinent here. It provides:

> A will, or any part of it, may not be revoked in a manner other than as provided in this section.

> * * * *

> (2) *Destruction.*—By burning, cancelling, tearing, or obliterating the same, by the testator himself, or by some other person in his presence and by his express direction and consent. . . .

In the context of this case, then, appellee had the burden to show that Doris's will was either destroyed by Doris or by appellee at Doris's direction, in her presence, and with her consent. The trial court clearly accepted appellee's testimony that he tore his mother's will in her presence, at her direction, and with her consent.

Nevertheless, appellants argue, *inter alia*, that appellee's uncorroborated testimony as to the destruction of the will was insufficient to establish compliance with E.T. § 4–105, because appellee stood to benefit from the revocation. For this proposition, appellants rely on the following language from *Preston:*

> [T]he mere statement of an interested witness, that a paralytic, mentally incompetent, physically feeble, and entirely without the use of one side of her body, tore the paper in pieces so small that they could not be placed together so as to be legible, did not conclusively establish the fact of the physical destruction by the testatrix of the paper left in her possession, at a time when she was in the sole care and custody of the appellees. And when those facts are taken in connection with the further fact that under the wills of September and November, 1923, they were the principal

beneficiaries, it may be inferred that they secreted or destroyed the will of 1919 for their own purposes.

149 Md. at 512, 132 A. 55.

*Preston* is factually inapposite. Nor do we agree with appellants' characterization of *Preston* as mandating that the uncorroborated testimony of a person who stands to benefit from revocation is inherently insufficient to satisfy the burden of proof. Instead, we read the quotation as the trial court did in the case *sub judice:* "It is a matter of weight."

In *Preston,* the testatrix was completely paralyzed on her right side and used a wheelchair. Despite her condition, to which three doctors testified, appellees testified that the testatrix *herself* tore her will with her left hand into such tiny pieces that the appellees, who stood to benefit from destruction, were unable to put the pieces together. Moreover, the appellees testified that the testatrix then *threw* the pieces into an open hearth. Understandably, the Court found the appellees' testimony completely incredible in light of the testatrix's physical condition. In contrast, the appellee in this case testified that *he* was the one who destroyed Doris's will, but that he did so upon his mother's instruction.

Appellants have not referred us to any controlling authority to support their assertion that the trial court was obligated to disregard appellee's testimony concerning the destruction of the will, because the testimony was uncorroborated. In this regard, we note that even in a criminal case, when a defendant's freedom—not property—is at stake, the testimony of a single eyewitness, *if believed,* is sufficient to sustain a conviction. *See Branch v. State,* 305 Md. 177, 183, 502 A.2d 496 (1986). Surely, the standard would be no greater here. Moreover, what the Court said in *Kaufman v. Baltimore Transit Co.,* 197 Md. 141, 145, 78 A.2d 464 (1951), is pertinent here:

If the testimony of one witness at the trial is legally sufficient, it matters not that this testimony may be contradicted by ten witnesses for defendant, or even that it may be in conflict with statements before the trial, or testimony

in a previous trial or other legal proceeding, of the same witness.

In rejecting appellants' contention, we are mindful that it was the exclusive responsibility of the trial court to assess the credibility of witnesses and to resolve conflicts in the evidence, in order to decide if the will was destroyed as prescribed by E.T. § 4–105. That we might not have reached the same conclusion if we were the trier of fact is beside the point; it is not the function of an appellate court to judge the credibility of witnesses or to resolve conflicts in the evidence. *See Jones v. State,* 343 Md. 448, 465, 682 A.2d 248 (1996); *McCoy v. State,* 118 Md.App. 535, 537–38, 703 A.2d 237 (1997).

### III.

Appellants next argue that the trial court erred in requiring them to prove that Doris lacked the requisite mental capacity to revoke her will. As we see it, the trial court did not place the burden upon appellants to prove Doris's mental incapacity. Thus, appellants' contention must fail. We explain.

The trial court specifically addressed the matter of burden of proof in the context of discussing Doris's capacity. Because of the importance of the court's remarks with respect to the contention that we now consider, we shall repeat part of what the court said:

Now as I indicated when we have a contest to a Last Will and Testament and the capacity of the testator or testatrix, the burden is on the party who is attacking that will to prove incapacity. *I am not certain whether that burden by law is applicable here where one is attacking a revocation. It probably is not because of the terminology of the statute which has to have the revocation at the direct ... direction or expressed direction and consent.* But in any event, I'm not convinced that she was incapable mentally, even though she had her problems and they are ... were great. I'm not convinced that she was incapable of understanding the consequences of her revocation.... Regardless of who has the burden, and that's a legal matter, *from all of the*

*evidence, I would find that she was capable. That she had the capacity to understand. She had the capacity to consent, understood the consequences of placing her mark upon the document and understood the consequences of the eventual destruction of the prior will.*

(Emphasis added).

It appears to us from the above quoted text that the trial court assumed that appellee had the burden, but then determined that the issue was of no import, because the court was satisfied that Doris had the capacity to revoke. Accordingly, we need not resolve the issue of burden of proof with respect to capacity in a revocation case.

■ Nonetheless, *Slicer v. Griffith,* 27 Md.App. 502, 510, 341 A.2d 838 (1975), is instructive, although it concerned testamentary capacity to execute, not destroy, a will. There, we specifically addressed the question of which party had the burden of proof regarding the testator's capacity. After observing that the rule in Maryland is that a testator is presumed to be competent to execute a will, we stated: "[G]enerally, in view of the presumption of sanity, the caveators bear the burden of proving testamentary incapacity." *Id.* at 508, 341 A.2d 838. We also noted that the usual practice in Maryland involves the caveatees calling witnesses to elicit facts regarding execution of the will and specifically whether the testator appeared to possess a sound mind and body. *Id.* at 508 n. 1, 341 A.2d 838. Even if the presumption of competency is overcome, however, this does not conclusively establish incapacity. *Ritter v. Ritter,* 114 Md.App. 99, 107, 689 A.2d 101, *cert. denied,* 346 Md. 240, 695 A.2d 1229 (1997); *see* 3 William J. Bowe & Douglas H. Parker, *Page on the Law of Wills* § 29.137, at 696 (Rev. ed. 1960) ("If the act of revocation is established, but the proponent claims that such act was done while the testator was incompetent, or that it was induced by undue influence, the burden of proving incapacity, undue influence and the like is on proponent." (footnotes omitted)); *cf.* 95 C.J.S. *Wills* § 385, at 281 (1957) ("The burden is on one asserting revocation of a will by destruction

to prove that the will was destroyed by the testator with intent to revoke and that the testator was competent at such time." (footnote omitted)); *see also Webster v. Larmore,* 268 Md. 153, 158, 299 A.2d 814 (1973); *Arbogast v. MacMillan,* 221 Md. 516, 523, 158 A.2d 97 (1960) ("[I]n the absence of proof of prior permanent insanity, it must be shown that the testator was of unsound mind at the time the will was executed in order to overcome the presumption of sanity.").

## IV.

As an alternative to the previous issue with respect to burden of proof, appellants challenge the trial court's factual finding that Doris had the requisite capacity to revoke her will. Appellants contend that, even if they had the burden of proving Doris's incapacity, they met that burden. Regardless of how the issue is framed, the crux of appellants' argument is that the evidence was insufficient to support the court's conclusion that Doris possessed the capacity to revoke her will.

In addition to satisfying the formalities of revocation, it is clear that "[n]o will can be revoked unless the testator has, at the time of revocation, the capacity to understand the nature and effect of the act, and such act must be free and voluntary...." *Hunter v. Baker,* 154 Md. 307, 316, 141 A. 368, *cert. denied,* 278 U.S. 627, 49 S.Ct. 28, 73 L.Ed. 546 (1928); *see also* 2 Bowe & Parker, *supra,* § 21.1, at 346 ("Revocation [by a physical act] requires that the testator have a revoking intent and frame of mind (animus revocandi) simultaneously coincident with his physical act on the will document."). The capacity required to revoke a will is the same as the capacity required to make one. *Preston,* 149 Md. at 505, 132 A. 55; *see Hunter,* 154 Md. at 316, 141 A. 368; *see also* E.T. § 4–101 ("Any person may make a will if he is 18 years of age or older, and legally competent to make a will."). Indeed, making a will requires no greater capacity than that required to make a gift, "[a]nd it may be a very simple act." *Mecutchen v. Gigous,* 150 Md. 79, 86, 132 A. 425 (1926); *see*

*also* Philip L. Sykes, *Contest of Wills in Maryland* § 61, at 72 n. 3 (1941).

We recently reiterated the standard for determining testamentary capacity:

> It must appear that *at the time of making the will,* [the testator] had a full understanding of the nature of the business in which [the testator] was engaged; a recollection of the property of which [the testator] intended to dispose and the persons to whom [the testator] meant to give it, and the relative claims of the different persons who were or should have been the objects of [the testator's] bounty.

*Ritter,* 114 Md.App. at 105, 689 A.2d 101 (emphasis in original) (quoting Sykes, *supra,* § 61, at 72); *see also Phelps v. Goldberg,* 270 Md. 694, 698, 313 A.2d 683 (1974); *Webster,* 268 Md. at 165–66, 299 A.2d 814; *Sellers v. Qualls,* 206 Md. 58, 66, 110 A.2d 73 (1954); *Doyle v. Rody,* 180 Md. 471, 475, 25 A.2d 457 (1942).

Here, neither side produced medical records concerning the decedent or expert testimony regarding Doris's mental capacity. Instead, both sides presented conflicting lay evidence regarding Doris's capacity, including lay opinions. In deciding whether a testator had the capacity to execute or revoke a will, lay opinion testimony is admissible, so long as the witness's testimony shows "facts sufficient to justify the conclusion reached." *Doyle,* 180 Md. at 481, 25 A.2d 457; *see Ingalls v. Trustees of Mt. Oak Methodist Church Cemetery,* 244 Md. 243, 257–58, 223 A.2d 778 (1966).

Appellants acknowledge that the trial court's factual findings with regard to Doris's capacity cannot be reversed unless clearly erroneous. *See* Md. Rule 8–131(c). They argue, however, that this case is like *Doyle* and *Davis v. Denny,* 94 Md. 390, 50 A. 1037 (1902), in which the testators were held not to possess sufficient mental capacity. Those cases, however, are readily distinguishable because of the quantity and quality of evidence as to capacity that was presented.

In *Doyle,* the testator's funds were the exclusive source of two joint bank accounts that he held with his brother, each

with the right of survivorship. The accounts were created just two weeks after the testator was diagnosed with "cerebral arteriosclerosis, senile deterioration and softening of the brain, and an increase in blood cells, which caused him to be mentally abnormal and confused." 180 Md. at 473, 25 A.2d 457. Two weeks after creating the trust accounts, the testator died as a result of his condition. The administrator argued that the accounts belonged to the estate, because Doyle lacked the requisite mental capacity to create the accounts and his brother exerted undue influence upon him.

At trial, four medical experts, including two who had diagnosed the testator's condition, concluded that the testator could not possibly have been of sound mind when he created the trusts. This testimony contradicted that of the bank's doctor, who had certified that, despite the testator's condition, he was of "sound and disposing mind." *Id.* at 474, 25 A.2d 457. In addition, the Court noted that neither of the witnesses from the bank could recall who sought to open the trust accounts, nor could they say whether anyone explained to the testator how the money would pass upon his death. *Id.* at 480, 25 A.2d 457. In affirming the lower court's decision to invalidate the trusts, the Court agreed that, when they were created, the decedent suffered from an insane delusion.

In *Davis,* the 82 year old testatrix executed a will at a time when she had spoken about her dead siblings as if they were still alive. Moreover, she did not tell her attorney that the house in which she lived was part of her estate, and she made bequests constituting only a fraction of her wealth, because she did not believe there would be any money left after those bequests. On the morning after executing the will, the testatrix told one of the attesting witnesses that she was surprised to learn that she had made a will and asked to know what was in it. At trial, the physician who had cared for the testatrix for 30 years testified that the decedent was not of sound mind when she made the will, and "he doubted very much if she was at that time competent to make it." *Davis,* 94 Md. at 396, 50 A. 1037. Although two other medical experts who had observed the testatrix months after she executed the will testi-

fied that she did not seem to be impaired, the Court held that the testatrix was not competent when she made her will.

[18] Turning to the case *sub judice,* appellants argue that the testimony of Doris's sister-in-law, Hope Schrader, and Doris's former caretaker, Alta Martin, demonstrate that Doris did not have the capacity to revoke her will on September 10, 1995. Appellants assert:

> Both witnesses had ample opportunity to observe Doris Showe and assess her mental capabilities, and both of them stated the reasons for her opinion. The Appellee presented no opinion testimony, lay or expert, as to Doris' mental capacity. There was no evidence legally sufficient to support the trial court's finding that Doris Showe did not lack capacity.

We acknowledge that the testimony of Schrader and Martin supports appellants' contention that Doris was in failing health and that she did not have the capacity to revoke her will. Nevertheless, appellants overlook that other evidence was presented to the trial court that conflicted with appellants' evidence, and the trial court was entitled to credit that evidence.

Unlike Schrader and Martin, Tressler, one of Doris's caretakers, was present to witness Doris's mark on the document that stated Doris was declaring all previous wills invalid. *See Arbogast,* 221 Md. at 525–26, 158 A.2d 97; *Ritter,* 114 Md.App. at 105–08, 689 A.2d 101 (indicating that evidence regarding testator's capacity must relate to the time the will was executed); *Wall v. Heller,* 61 Md.App. 314, 328–29, 486 A.2d 764 (same), *cert. denied,* 303 Md. 297, 493 A.2d 350 (1985). Moreover, as we observed, Tressler claimed that Doris understood what was being said to her, she could recognize the people close to her and could say their names, and she was "comprehensive, very comprehensive." Although Tressler was not specifically asked for an opinion as to capacity, the facts about which she testified regarding Doris's interaction with people, her ability to comprehend, and her physical capabilities cer-

tainly supported the trial court's finding that Doris had the capacity to revoke her will.

The court was also entitled to consider the testimony of appellee, who said that he read the subject will to his mother and asked her if it was what she wanted. Appellee also stated that Doris shook her head and said "no." Further, appellee claimed that he informed his mother that if she revoked the will, all of her property would pass to him. This testimony differs considerably from that before the Court in *Doyle*. There, with regard to the creation of the joint bank accounts benefitting the decedent's brother, the Court observed:

> [N]either the president of the bank nor the cashier could recall who had requested that the accounts be opened in trust form. They were unable to say whether Doyle had indicated that he wanted his brother to have the money, or whether anyone had explained how the money would pass upon his death.

*Doyle*, 180 Md. at 480, 25 A.2d 457.

Additionally, the court below had before it a document with Doris's mark, witnessed by Tressler and Smith— two people who do not stand to gain from her intestacy— indicating that she was declaring her previous will void. To be sure, that Doris put her mark on the revocation document did not conclusively establish, as a matter of law, that she had the requisite mental capacity to revoke her will. *See Doyle*, 180 Md. at 480, 25 A.2d 457. But quite unlike *Doyle* and *Davis*, there was no evidence that Doris suffered from delusions.

Moreover, although appellants correctly point out that appellee did not present any expert testimony as to capacity, it is equally noteworthy that appellants also failed to present any expert testimony.[4] Clearly, Doris needed round-the-clock care

---

4. Although neither side was required to present expert testimony as to Doris's mental capacity, it surely would have enhanced their respective presentations. *Cf. Davis v. DiPino*, 121 Md.App. 28, 54, n. 6, 708 A.2d 357, 370, n. 6 (1998) (en banc).

at home, and she had difficulty talking and getting around. Yet we cannot say that a stroke which leaves a person physically crippled necessarily renders that person incapable of possessing sufficient mental capacity to revoke a will. *See Rogers v. Hickam,* 30 Tenn.App. 504, 208 S.W.2d 34, 37 (1947). Nor is the inability to speak indicative of an inability to comprehend. *See Webster,* 268 Md. at 165, 299 A.2d 814 (and cases cited therein); 1 Bowe & Parker, *supra,* §§ 12.43–12.45, at 653–55; Albert W. Northrop & Robert Schmuhl, *Decedents' Estates in Maryland* § 4–4(d), at 131–42 (1994). Therefore, viewing the facts in the light most favorable to appellee, as we must, we conclude that there was sufficient evidence to support the trial court's finding that Doris possessed the requisite capacity to revoke her will. Accordingly, the trial court's finding was not clearly erroneous.

## V.

 Appellants assail the trial court's admission of the document that stated Doris was declaring her previous wills void. The trial court admitted the document as evidence of Doris's intent to revoke her will. Maryland Rule 5–803(b)(3) sets forth the following exception to the hearsay rule:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove the declarant's then existing condition or the declarant's future action, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Appellants nonetheless assert that the document was inadmissible hearsay. They contend that the document was not a forward-looking statement of intent, but instead was a statement of present action. We disagree.

Mere execution of the document by Doris was not sufficient to revoke her will. Under E.T. § 4–105(2), revocation requires "burning, cancelling, tearing, or obliterating the [will], by the testator himself, or by some other person in his presence and by his express direction and consent...." Consequently, revocation was not accomplished until appellee tore the will in Doris's presence, pursuant to her express direction and with her consent. Therefore, we believe the document was within the ambit of the hearsay exception contained in Md. Rule 5–803(b)(3). It follows that the trial court did not err in admitting it as evidence of Doris's intent to revoke her will. *Cf. Farah v. Stout*, 112 Md.App. 106, 119, 684 A.2d 471 (1996) (holding trial court correctly prevented admission of statements made by testator that he intended to pay money to appellant upon testator's death because the statements were offered to prove inaction, not future action), *cert. denied*, 344 Md. 567, 688 A.2d 445 (1997).

### Conclusion

We hold that the trial court was not clearly erroneous in finding that Doris effectively revoked her will of February 7, 1992 with the requisite mental capacity. At the same time, we are compelled to acknowledge the obvious inequity that flows from our decision.

Doris and Max were married for many years. In executing mirror wills, it is evident that the couple planned to bequeath the remainder estate of the surviving spouse to all three of the parties to this case. We do not know the extent to which Doris's estate was enriched by property she inherited from Max, who died shortly before she did. Nevertheless, it is apparent that Max left his entire residuary estate to Doris with the expectation that, if she died after he did, a portion of the property that Max bequeathed to Doris would pass to his two daughters, among others. Yet Max's daughters will not inherit anything from their father. Instead, Doris's entire estate, including that which Doris inherited from Max, will pass to appellee.

■ We recognize that Doris was entitled to change her will after her husband's death. *See Moats v. Schoch,* 24 Md.App. 453, 465, 332 A.2d 43 (1975). That change occurred, however, only because appellee initiated the course of events that culminated in his ailing mother's revocation of her will. Had appellee left matters alone, the couple's once mutual intent to leave the bulk of their estates to their three children surely would have been accomplished.

For reasons not apparent to us, appellants never contended that appellee exerted undue influence upon his mother. In this regard, we are mindful of what the Court said in *Doyle,* 180 Md. at 479–80, 25 A.2d 457:

It is recognized ... that aged and infirm persons *in extremis* may be easily imposed upon by those in whom they confide. When, therefore, a relative ... arranges for the preparation of such a person's testamentary disposition in his own favor, such an act generally excites suspicion. And where it is found that a person was so weak in mind or body that he was a mere passive instrument in the hands of others, and the court can presume that the person through whose influence the will was made for his own benefit was conscious that he was obtaining an unjust disposition, it is obvious that the will should not be permitted to stand.

Nevertheless, the issue of undue influence was not raised below, and it is not before us.

To be sure, our review of the cold record in this case generates concern as to Doris's capacity, especially when one considers her skeletal responses to her son's inquiries, her inability to engage in meaningful dialogue, the fact that her son initiated the events that culminated in destruction of Doris's will, and the absence of expert testimony. We recognize, however, that the trial court was in the best position to view the demeanor of the witnesses and assess their credibility. As appellate judges, our role is limited to a review of the evidence in the record and the issues presented, solely to determine whether the court committed legal errors or made clearly erroneous findings of fact; we may not substitute our

**320**

judgment for that of the trial court. Because we cannot say the judge erred, we shall affirm.

**JUDGMENT AFFIRMED;**

**COSTS TO BE PAID BY APPELLANTS.**